Sixth Division
September 28, 2007

No. 1-06-1272

| | | |
|---|---|---|
| *In re* DETENTION OF Brad LIEBERMAN | ) | Appeal from |
| | ) | the Circuit Court |
| (The People of the State of Illinois, | ) | of Cook County |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | 00 CR 8000101 |
| | ) | |
| Brad Lieberman, | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Dennis J. Porter, |
| | ) | Judge Presiding |

PRESIDING JUSTICE McBRIDE delivered the opinion of the court:

In 2006, a jury found respondent, Brad Lieberman, to be a sexually violent person under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 1998)). Following a subsequent dispositional hearing, the trial court ordered respondent committed to the Illinois Department of Human Services (DHS) for institutional care in a secure facility. Respondent appeals, arguing that: (1) he is entitled to judgment notwithstanding the verdict; (2) the trial court abused its discretion by admitting evidence of the details of his past crimes; (3) the court erred by excluding expert testimony; (4) the court abused its discretion by denying his motion for a new trial; (5) the court abused its discretion by ordering him confined for institutional care in a secure facility; and (6) the court erred in denying his renewed motion to dismiss based upon his corrected release date.

In 1980, respondent was convicted in the circuit court of Cook County of six counts of rape (Ill. Rev. Stat. 1981, ch. 38, par. 11-1)) and one count of attempted rape. That same year, respondent was found guilty of one count of rape and one count of attempted rape in Lake

County. Respondent was sentenced to a number of concurrent terms of imprisonment, the longest of which required him to serve 40 years in prison.

Following numerous appeals on matters unrelated to the issues raised in this case, respondent was scheduled to be released from the Illinois Department of Corrections (DOC) on January 9, 2000. The present action began on January 6, 2000, when the State filed a petition pursuant to the Act seeking to have respondent adjudicated a sexually violent person and committed to the care and custody of the DHS. The petition alleged that respondent had been convicted of a number of sexually violent offenses and was dangerous to others because his mental disorders created a substantial probability that he would engage in future acts of sexual violence. On February 10, 2005, following a hearing, the trial court found that there was probable cause to conduct further proceedings on the State's petition and ordered that respondent be detained at a facility approved by the DHS until trial.

At respondent's trial, the State presented the testimony of two expert witnesses: Dr. Jacqueline Buck and Dr. Barry Leavitt. Dr. Buck is a clinical psychologist and special evaluator for the DOC. Dr. Buck testified that she conducted one two-hour interview with respondent in October 1999 and reviewed his master file as well as numerous other documents. Her review included psychological and psychiatric evaluations of respondent, police reports, and other court documents provided by the DOC detailing the events that led to respondent's various convictions. Based upon her review and evaluation, Dr. Buck believed that respondent was at a high risk to sexually reoffend if he was released into the community without treatment and, in October 1999, she prepared a report to that effect. Dr. Buck updated her opinion every year thereafter and,

although she did not conduct any additional interviews of respondent because he refused to speak with her, Dr. Buck did not believe that an additional interview was warranted because respondent refused to participate in sexual offender treatment. Accordingly, Dr. Buck's opinion had not changed since she prepared her initial 1999 report and she believed that respondent continued to be at a high risk to sexually reoffend.

Dr. Buck testified that, in forming her opinions, she relied upon respondent's criminal history and the facts from cases in which he was convicted of rape and cases in which he was arrested and charged with a sexually related offense. According to Dr. Buck, respondent refused to discuss these crimes with her and characterized them as "just being in the wrong place at the wrong time," "overzealous police officers," and "mistaken identity." Over respondent's objection, the trial court allowed Dr. Buck to describe the facts from the cases that she relied upon in forming her opinion. For example, Dr. Buck testified that respondent gained entry into the victim's home by stating that he was a plumber and that the building's management had sent him to check on leaks. Once inside, respondent moved to the victim's bedroom and asked her to remove items from the closet. When the victim was facing away from him, respondent grabbed her around the throat, held a knife to her throat and threatened to hurt her if she did not comply. Respondent then put the victim on the bed and forced her to perform various sexual acts. Dr. Buck testified in a similar manner as to the facts from respondent's other rape convictions and from cases in which respondent was arrested and charged with a sexual offense. The trial court instructed the jury that this testimony was being offered to show the basis of Dr. Buck's opinions and not to prove the truth of the matters asserted.

In arriving at her opinions, Dr. Buck also considered evidence of respondent's behavior while he was incarcerated in the DOC and in the custody of the DHS. This evidence established that, while in the DOC, respondent told the staff that he was not an inmate because he did not commit the offenses for which he was convicted. During that time, respondent was also found with cannabis, tested positive for morphine, and disciplined five times for drugs or drug paraphanelia. Respondent also received disciplinary reports for his conduct, was placed in segregation numerous times, and engaged in acts of intimidation, threats and other rule violations. Respondent had his visiting privileges revoked after demonstrating inappropriate behavior with a female in the visitor's room and received a disciplinary report after he was found in the visitor's bathroom engaged in sexual activity with a woman. While in the custody of the DHS, respondent exhibited "angry, hostile, aggressive behaviors" on many instances and insisted that he was being illegally detained.

Dr. Buck also reviewed correspondence that respondent wrote to eight women over a period of approximately 10 months while he was incarcerated. On one occasion, respondent wrote to a woman he saw on television in an attempt to begin a friendship with her. In that letter, respondent enclosed a picture of himself and indicated that he was lonely and that he was in prison because he beat up a man who had beaten up his sister. On another occasion, respondent wrote to a women whose picture he had seen in the newspaper, stating "how beautiful she was, "how sweet and how hot," and "how lucky he would be to have a friend like her." In another instance, respondent used "a lot of profanity" in a letter he wrote to a woman whom he was upset with for not attending a prison picnic. Although she acknowledged that many inmates correspond

with women outside the prison, Dr. Buck noted that almost all of these women had objected to the letters that respondent sent them. Dr. Buck also acknowledged that respondent only wrote letters to one woman after he was told to stop by the prison staff.

Based upon all of these considerations, Dr. Buck diagnosed respondent with paraphilia not otherwise specified, sexually attracted to nonconsenting persons (paraphilia nos). Dr. Buck described the group of paraphilia disorders, which are contained in the Diagnostic and Statistical Manual of Mental Disorders (DSM), as essentially "sexually deviant behaviors," and testified that in this case, "we have what the law calls rape behavior, sexual assaults with nonconsenting women." Dr. Buck testified that the first criterion for paraphilia is that there be "intense recurring sexually arousing urges, fantasies or thoughts or behaviors which occur over at least a 6 month period of time," and that respondent met this criterion based on his multiple rapes committed over a 10-month period. The second criterion for paraphilia nos is that these behaviors cause distress or impair respondent's ability to function socially in the workplace or society. Respondent's detention in the DOC and DHS met this criterion, and Dr. Buck testified that respondent is "not able to be in society and function the way other folks do." The final criterion is that respondent must be at least 16 years old at the time of the diagnosis. Respondent met this criterion based on his age at the time of trial.

Dr. Buck explained that respondent suffers from paraphilia notwithstanding that he has not committed any rapes since he was incarcerated in 1980. According to Dr. Buck, respondent has been in a controlled environment in the DOC, which goes "out of [its] way" to protect its females workers. Respondent also continually crossed boundaries and exhibited inappropriate sexual

behavior while incarcerated and in the custody of the DHS. Dr. Buck further explained that paraphilia nos is a "very deep-seeded problem" that requires intensive treatment and does not heal itself or go away while someone who suffers from it is in prison. Moreover, although the 15 mental health evaluations respondent underwent while incarcerated did not diagnose paraphilia, Dr. Buck was the first examiner to do a sex-offender-specific evaluation.

Dr. Buck also diagnosed respondent with cannabis abuse and antisocial and narcissistic personality disorders. Dr. Buck described antisocial personality disorder as "the disregard for and violation of the rights of others," and narcissistic personality disorder as someone who is "very grandiose" in thought or behavior, who requires admiration, and exhibits a lack of empathy.

Dr. Buck also conducted a risk assessment using four actuarial tools to determine respondent's risk of committing future acts of sexual violence. Specifically, Dr. Buck employed: (1) the Minnesota Sex Offender Screening Tool Revised (MnSOST-R); (2) the Static-99; (3) the Violence Risk Appraisal Guide (V-RAG); and (4) the Sex Offender Risk Appraisal Guide (SORAG). Respondent scored "very high" under the MnSOST-R, "extremely high" under the Static-99, "high" under the V-RAG, and "extremely high" under the SORAG.

Dr. Buck stated that she looked for mitigating factors to consider in reaching her opinions. According to Dr. Buck, the DHS offers a variety of activities in addition to the core sex offender program. These include ancillary groups, which focus on, among other things, anger management and intermittent relationship skills and substance abuse treatment, and recreation therapy programs, which attempt to teach sex offenders alternative ways of recreating. Dr. Buck testified that respondent has refused to participate in any of these programs and that she was therefore

6

unable to find any mitigating factors. Dr. Buck also considered respondent's age and testified that, because he scored as a psychopath, respondent did not exhibit the usual pattern of decreased crime corresponding to increased age.

Dr. Buck concluded that in her opinion, within a reasonable degree of psychological certainty, respondent suffers from mental disorders that are both congenital and acquired, affect his emotional and volitional capacity, and predispose him to commit future acts of sexual violence. Based upon her clinical evaluation, review of respondent's files, respondent's lack of sex offender treatment, and the actuarial instruments she employed, Dr. Buck opined that it is substantially probable that respondent will continue to commit acts of sexual violence if released into the community.

On cross-examination, Dr. Buck testified that the Association for Treatment of Sexual Abusers (ATSA) recommends the use of multiple sources of information when making evaluations such as those in this case. Dr. Buck was also not aware that several of respondent's convictions were overturned by the appellate court. Dr. Buck acknowledged that in her evaluation she did not rely upon a 1991 psychological examination of respondent conducted by Dr. Michael Guttman, whose examination of respondent revealed "no overt symptoms of gross psychopathology" and no diagnosis of paraphilia, cannabis abuse or narcissistic disorder. Dr. Buck also acknowledged that the inquiry board investigation into respondent's loss of visitation privileges with a woman due to inappropriate behavior in the visitor's room indicated that respondent lost those privileges due to an incident between the woman and her ex-husband, and that the board recommended that respondent's visiting privileges with that woman be reinstated.

According to Dr. Buck, respondent took two Minnesota Multiphasic Personality Inventory tests while he was incarcerated. The psychologist who administered these tests diagnosed respondent with psychosexual disorder and mixed personality disorder with antisocial, narcissistic and dependent features. Dr. Buck acknowledged that the original version of the MMPI, which respondent took in 1986, is no longer recommended for clinical use and was revised because it exaggerated individuals' mental health problems and generally over-diagnosed people with psychological problems. Additionally, the psychologist who performed the MMPI tests did not diagnose respondent with paraphilia nos or cannabis abuse.

According to Dr. Buck, respondent was evaluated by a psychologist and psychiatrist while incarcerated in 1989. The psychologist did not diagnose respondent with paraphilia, cannabis abuse, or narcissistic and antisocial personality disorders, although Dr. Buck testified that these diagnoses were appropriate for these evaluations. The psychiatrist who evaluated respondent concluded that he had no psychiatric history or acute psychiatric problems, and Dr. Buck explained that this diagnosis was consistent with her opinions because respondent is not mentally ill and therefore does not have acute psychiatric problems.

On cross-examination, Dr. Buck also testified that it was important for the results of actuarial instruments to be replicated by other psychologists before they are relied upon to determine if someone should be civilly committed. Dr. Buck acknowledged that Dr. Karl Hanson prepared an article which Dr. Buck considered to be authoritative in the field of sexually-violent-person evaluations indicating that the replication strength of the actuarial instruments upon which Dr. Buck relied was low and that one of those actuarial tools was not intended to assess the risk

for sexual recidivism. Dr. Buck also acknowledged that according to Dr. Hanson's article, three of the four risk scales that she used on respondent do not predict the specific kind of recidivism that is at issue in this case and that, according to the American Psychological Association (APA), the ability to predict sexual recidivism is only a matter of general and uncertain probabilities.

Dr. Buck also used a personality inventory called the Hare Psychopathy Checklist - Revised (PCL-R) to assess respondent's risk to recidivate and to substantiate her diagnoses of antisocial and narcissistic personality disorders. She did not ask respondent all of the questions contained in the PCL-R interview schedule because those questions were required to be asked only if respondent took personal responsibility for his conduct. Dr. Buck did not recall reviewing a binder containing recommendation letters and affidavits regarding respondent from various state employees who have known him since 1980.

Dr. Buck testified under cross-examination that she made several errors in scoring respondent's actuarial results and that, according to Dr. Hanson, some of the risk factors upon which she relied could not be used to predict if a person will sexually reoffend. Dr. Buck acknowledged that, according to a 2001 brief by the APA submitted in another case, substance abuse and personality disorders usually have little explanatory connection to an offender's sexual behavior. Moreover, according to Dr. Hanson, offenders who denied their offenses are at no higher risk to recidivate than are other sexual offenders.

Dr. Buck further testified that respondent was assigned a primary therapist when he was placed in a DHS treatment and detention facility in 2000. During that time, approximately 14 master treatment plans were prepared by respondent's primary therapist and other mental health

staff. Dr. Buck acknowledged that 12 of those treatment plans did not diagnose respondent with narcissistic personality disorder, although they did indicate narcissistic features, and that 11 of those plans did not diagnose respondent with cannabis abuse. Dr. Buck also acknowledged that none of the 15 evaluations conducted while respondent was incarcerated diagnosed him with narcissistic personality disorder or cannabis abuse, but testified that those evaluations did not diagnose cannabis abuse because they were not "substance abuse focused."

Dr. Buck gave specific testimony on cross-examination regarding respondent's volitional control. Dr. Buck testified that professionals in her field do not measure volitional control as "high, low, up, [or] down," and explained that she was not aware of any way of measuring volitional capacity. Rather, according to Dr. Buck, respondent's mental disorders impact his emotional and volitional control by warping his perceptions and feelings, which allows him to exhibit sexually assaulting behavior. Dr. Buck testified that respondent has volitional control and capacity to do what he wants because he is not mentally ill, and that those without volitional control are mentally ill and include schizophrenics and manic-depressives who are not taking medication and are usually in a psychiatric hospital. Dr. Buck further testified that respondent committed the crimes intentionally and made a volitional choice to execute them, and that "all of [respondent's] behavior over the past well documented 26 years screams that he has volitional control, volitional capacity."

Dr. Barry Leavitt is a clinical psychologist who specializes in sexually-violent-person evaluations. Because respondent refused to be clinically interviewed, Dr. Leavitt conducted his evaluation by reviewing respondent's master file. According to Leavitt, an examination based

solely on a review of available records is an acceptable method of conducting a sexually-violent-person evaluation.

Dr. Leavitt testified that, in his expert opinion, respondent suffers from: (1) paraphilia nos; (2) antisocial personality disorder; (3) narcissistic personality disorder; and (4) cannabis abuse within a controlled environment. Dr. Leavitt explained that paraphilia was the primary predisposing condition that compelled respondent to commit sexually violent acts and that respondent's other disorders act as disinhibiting influences that make it easier for him to exhibit sexually violent behavior. Dr. Leavitt further testified that respondent's paraphilia is a congenital or acquired disorder that affects his volitional or emotional control and predisposes him to commit future acts of sexual violence. Dr. Leavitt explained that respondent's recurrent sexual behaviors were not simply impulse driven but, rather, highly planned and consistent with someone who is compelled to engage in sexually deviant behavior. Moreover, paraphilia cannot be cured but it can be controlled through treatment. Dr. Leavitt opined that, in his expert opinion, there is a substantial probability that respondent will commit future acts of sexual violence unless he participates in appropriate treatment.

Dr. Leavitt explained how respondent's "sexual offending" formed his diagnosis of paraphilia. According to Dr. Leavitt, respondent qualified for a diagnosis of paraphilia nos, which requires a recurrent pattern of sexual urges, fantasies or behaviors toward nonconsenting persons over a period of at least six months, because he was identified by 16 women as having or attempting to have committed sexually violent offenses against them and approximately half of those cases resulted in convictions. Another criteria for paraphilia nos involves these sexual

11

behaviors leading to maladaptive social and occupational functioning, which was evidenced by respondent's significant period of incarceration. Paraphilia also requires that the sexual behavior have been committed over this length of period of time, which in this case was satisfied by respondent's sexual behavior toward nonconsenting females recurring over a 10-month period.

Dr. Leavitt used actuarial instruments to conduct a risk assessment and measure respondent's likelihood of reoffending. Respondent fell into the "high risk" category under both the Static 99 and the MnSOST-R actuarial tools. Both instruments are viewed as providing an underestimate of someone's future likelihood of reoffending. Respondent's results from these instruments served to confirm Dr. Leavitt's clinical judgment that it was substantially probable that respondent would commit future acts of sexual violence were he released into the community.

Dr. Leavitt also looked at additional "dynamic risk factors" that might serve to solidify, modify or aggravate the level of risk as determined by the actuarial instruments and the clinical impressions. Factors that Dr. Leavitt found to be relevant to respondent included: (1) attitudes that support sexual offending, such as a sense of entitlement, lack of acknowledgment and remorse for acts of sexual violence; (2) "intimacy deficits" or the quality of respondent's relationships and ability to see women as something other than objects; (3) "emotional and sexual regulation deficits," such as respondent's lack of remorse or empathy for what he has done; (4) "self-management deficits," such as respondent's unwillingness to respect others' boundaries, as evidence by the unsolicited letters respondent wrote while incarcerated; (5) antisocial proclivities or psychopathy due to a combination of antisocial personality disorder and sexual deviant

behavior; and (6) respondent's complete failure to participate in available treatment. Dr. Leavitt testified that based upon his clinical judgment and review of the actuarial result and risk factors, there is a high risk that respondent will sexually reoffend.

On cross-examination, Dr. Leavitt acknowledged that the ATSA advises psychologists to discuss the limits of any conclusions that are not based on a personal interview. However, Dr. Leavitt testified that he complied with that requirement by disclosing that respondent refused to be interviewed and that his report was based on a review of available records. Dr. Leavitt believed that this disclosure was consistent with his responsibilities under the ATSA and the APA.

Dr. Leavitt also disagreed with a treatise indicating that paraphiliac fantasies and ritualized behavior need to be elicited in order to diagnose paraphilia, and believed that, instead, he needed evidence of sexually arousing fantasies, urges or sexual behaviors. Dr. Leavitt made the same scoring errors as did Dr. Buck in scoring respondent's actuarial results, but testified that these errors would not change any of his conclusions.

Respondent's first witness was Dr. Fred Berlin, a psychologist and medical doctor who specializes in sexual disorders. Dr. Berlin was called to testify regarding the third criterion for being found a sexually violent person under the Act, namely, whether actuarial tools can be helpful in determining if respondent's mental disorder makes him likely to commit future acts of sexual violence. Dr. Berlin explained that an actuarial method is "a statistical method for trying to identify a group of individuals that will contain within it a higher number of people who are at risk of a certain outcome." Dr. Berlin testified that actuarial instruments, while helpful in identifying and distinguishing between groups that are at a high and low risk of sexually reoffending, cannot

13

accurately predict the likelihood that a particular individual will commit a future sexual offense. Dr. Berlin believed that clinical judgment was preferred over actuarial instruments because a clinician is more aware of the facts about a given individual. Dr. Berlin also characterized Dr. Buck's statements that the actuarial instruments placed respondent at an extremely high risk of sexually reoffending as misleading. Dr. Berlin acknowledged that neither Dr. Leavitt nor Dr. Buck used actuarial tools alone in arriving at his and her opinion in this case.

Dr. Diane Lytton, a psychologist experienced in treating sex offenders, also testified for respondent. Dr. Lytton reviewed respondent's master file, Dr. Buck's and Dr. Leavitt's reports, and Dr. Buck's deposition and trial testimony in this case. Dr. Lytton also interviewed respondent on three occasions for approximately 12 hours in July 2005 and interviewed several of his family members.

Dr. Lytton disagreed with the diagnoses of the State's experts and testified that, in her expert opinion, respondent does not suffer from a mental disorder that affects his emotional and volitional control and predisposes him to commit acts of sexual violence, and that it was not substantially probable that respondent would commit a sexually violent offense in the future. Dr. Lytton opined that respondent did not have a mental disorder because his sexual offenses occurred 26 years ago, the majority of those who commit rape do not have mental disorders, and respondent does not currently have recurrent intense sexually arousing fantasies, urges or behaviors that would support a diagnosis of paraphilia. Dr. Lytton gave considerable weight to respondent's family and social upbringing in arriving at his opinion and explained that respondent was close to his family, that he had been married and remained close to his ex-wife, that he held

numerous jobs growing up, and that he was very active in athletics and music. This showed Dr. Lytton that respondent was very engaged with others socially, although she acknowledged that a person with antisocial and narcissistic personality disorders might also participate in these activities. According to respondent's family, he was considerate, honest, and never violent or aggressive. Dr. Lytton also reviewed the 15 mental health evaluations compiled while respondent was incarcerated and opined that those evaluations, which did not diagnose paraphilia, narcissistic personality disorder or cannabis abuse, were inconsistent with the four disorders diagnosed by Dr. Buck and Dr. Leavitt.

Dr. Lytton also relied upon respondent's behavior while in prison in arriving at her opinions in this case. She gave little weight to respondent's marijuana use and noted that, while incarcerated, respondent obtained his GED, received letters of recommendation for good behavior, and was allowed to travel to coed correctional centers for prison band performances. Respondent underreported these activities during his evaluation, which Dr. Lytton found to be inconsistent with the personality disorders diagnosed by the State's expert witnesses. Dr. Lytton testified that even though respondent was in a secure facility, it was nevertheless significant that he was allowed to be around women because sexual assaults can and do occur in a prison environment.

Dr. Lytton also reviewed approximately 33 letters of recommendation from prison guards, officers and wardens. Examples of good behavior that were cited in these letters included intervening on behalf of an injured guard, coming to the aid of a severely beaten inmate and returning prison keys to the staff. Dr. Lytton's review of these letters indicated that respondent

followed most of the rules while incarcerated, that he was not aggressive, did not have anger control issues, was able to show empathy, and was a psychologically stable person. Dr. Lytton found it insignificant that respondent had refused treatment because doing so would be against his legal interests and testified that the State's experts' emphasis on respondent's refusal to undergo treatment was "real close to an ethical issue."

Dr. Lytton also explored respondent's attitudes toward women by interviewing him and reviewing his relations with his former wife and current fiancée and the unsolicited letters he sent to women while he was incarcerated. Dr. Lytton believed that it was important to know whether respondent has sexual fantasies or urges and, if so, to what extent they permeated his mental life. Dr. Lytton concluded that respondent did not have sexually deviant fantasies or urges and gave no indication of sexually deviant behavior.

Dr. Lytton also testified that respondent did not suffer from cannabis abuse because he freely admitted being caught with marijuana in prison, his last positive drug test occurred in 1998, and his reported five instances of marijuana use while in prison were insufficient to support a diagnoses of cannabis abuse. Dr. Lytton testified that respondent did not have narcissistic personality disorder and found that he was able to empathize with and demonstrate concern and care for others. Finally, Dr. Lytton opined that respondent did not have antisocial personality disorder, and found him to be revealing and willing to admit to his misconduct while in prison.

Dr. Lytton further testified that, in her expert opinion, respondent's behavior demonstrated that he had volitional control. For example, respondent was given jobs while in prison that required him to work in secure areas and his sexual offenses were well planned out. In

Dr. Lytton's expert opinion, respondent was not substantially probable to commit a future act of sexual violence. Contrary to a common misconception, most sexual offenders do not reoffend and government studies indicate that sexual offenders as a group recidivate at a lesser rate than other criminals. Dr. Lytton testified that actuarial instruments were inappropriate to predict the risk that a person will sexually reoffend and that they do not account for the most dynamic risk factor - a person's age. High risk sexual offenders recidivate at a lesser rate as they get older and, in respondent's case, his age equated to a low risk of recidivism. Dr. Lytton explained that she relied upon two risk assessment instruments in concluding that respondent was not substantially probable to reoffend: the MnSOST-R and the PCL-R. Dr. Lytton reviewed Dr. Buck and Dr. Leavitt's MnSOST-R score for respondent and found the results and the opinions derived therefrom erroneous. She testified that, in scoring respondent's MnSOST-R results, Dr. Leavitt improperly relied upon the letters that respondent wrote while incarcerated and that the proper scoring guidelines were meant to capture offenses that were or could have been actually prosecuted. Dr. Lytton discounted the unsolicited letters written by respondent as mutual and consensual attempts to "strike up relationships with women," which she believed was normal under the circumstances, and noted that respondent ceased writing letters after being told that it was inappropriate. According to Dr. Lytton, the risk factors that Dr. Buck relied upon were either unsupported by research or not effective in predicting risk of sexual reoffending. For example, Dr. Lytton did not believe that respondent's denial of his sexual offenses was an appropriate risk factor. Based on Dr. Lytton's analysis of those risk factors, including respondent's age and the low base rate of recidivism for sexual offenders, she concluded that

respondent was not substantially likely to commit a future act of sexual violence.

On cross-examination, Dr. Lytton testified that in arriving at her opinions in this case, she considered the details of respondent's past crimes. Over respondent's objection, the State reviewed the details of those offenses with Dr. Lytton, and Dr. Lytton acknowledged that those acts constituted sexual behavior with a nonconsenting person and that, in committing them, respondent demonstrated a lack of empathy toward his victims, a pervasive pattern of violating laws, and an inability to conform to social norms.

Dr. Lytton acknowledged that 11 master treatment plans prepared since respondent was detained in a DHS treatment and detention facility in 2000 reflect a diagnosis of paraphilia nos. Those treatment plans began in January 2000 and continued intermittently through June 2005. Dr. Lytton testified that she did not know who made those diagnoses, but that Dr. Buck's name did not appear in those reports and that Dr. Buck did not sign them. Dr. Leavitt also testified that the diagnoses in those plans were made after Dr. Buck's initial evaluation of respondent in 1999 and that they did not appear prior to that evaluation.

Dr. Michael Fogel is a licensed clinical psychologist who was the director of the Illinois Sex Offender Evaluation Unit from May 2003 to December 2005. In Dr. Fogel's opinion, actuarial instruments should not be used to evaluate sex offenders under the Act.

Finally, respondent called several other witnesses whose testimony established that respondent had contact with females during his incarceration that did not produce any incidents.

On February 6, 2006, the jury found respondent to be a sexually violent person under the Act. The case then proceeded to a dispositional hearing, at which time the trial court considered

the evidence adduced at trial as well as affidavits and an oral statement from respondent. The court noted that respondent was convicted of multiple sexual attacks on numerous women, which were the "most invasive" crimes aside from murder, that the jury found that respondent suffered from a mental disorder, and that, while respondent had arranged employment as a law clerk and to live with his fiancée, he also had refused to undergo treatment or acknowledge his past criminal offenses. Based upon these considerations, the court ordered respondent committed to the DHS for institutional care in a secure facility until further order of the court. This appeal followed.

Respondent first contends that he is entitled to judgment notwithstanding the verdict. Specifically, he contends that the evidence was insufficient because: (1) the State failed to prove that he suffers from a serious lack of volitional control resulting from a current mental disorder; (2) the State failed to prove beyond a reasonable doubt that he currently suffers from a mental disorder or that he presents any risk to reoffend; and (3) the State failed to prove any facts other than the convictions themselves to support the judgment.

The Act defines a sexually violent person as an individual who "has been convicted of a sexually violent offense *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 1998). The State must prove the allegations in its petition beyond a reasonable doubt. 725 ILCS 207/35(d)(1) (West 1998). On review, we ask only whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt. *In re Detention of Tittlebach*, 324 Ill. App. 3d 6,11 (2001).

19

Respondent first claims that the State failed to prove beyond a reasonable doubt that he has serious difficulty controlling his sexual behavior. Respondent's argument is primarily based on Dr. Buck's testimony that respondent is not mentally ill and that he committed his sexual offenses intentionally and with volition. Respondent essentially argues that, based upon this testimony, the State did not prove that he lacked the ability to control his sexually violent behavior. We disagree.

In resolving respondent's contention, we find instructive the decision in *In re Detention of Traynoff*, 358 Ill. App. 3d 430 (2005). In *Traynoff*, 358 Ill. App. 3d at 439, the court considered a similar claim that, based on the testimony of the State's experts that the respondent committed his sexual offenses with volition, the State had failed to prove that he lacked control over his sexually violent behavior. In rejecting that claim, the court noted that the State's experts testified that the respondent suffered from paraphilia nos, alcohol abuse, and severe antisocial disorder, that he had failed to accept blame or show remorse for his criminal conduct and instead transferred blame to others, and that the respondent was dangerous because his mental disorders created a substantial probability that he would engage in future acts of sexual violence. *Traynoff*, 358 Ill. App. 3d at 439-40. The court found that this was sufficient evidence to sustain the trial court's determination that the respondent lacked control of his sexually violent behavior, and proceeded to note:

> "[T]estimony that respondent committed these acts of sexual
>
> violence with volition does not prevent commitment under the Act.
>
> If we were to adopt such a position, all persons subject to

20

commitment would escape such a finding by declaring all of their

past criminal conduct to be volitional.  Under that view,

commitment would result only when a person confessed to an

inability to control his sexually violent behavior ***.  *** [T]he

Constitution's safeguards of human liberty in the area of mental

illness and the law are not best enforced through precise, bright-line

rules." *Traynoff*, 358 Ill. App. 3d at 440.

Similarly, in this case, we find that there was sufficient evidence presented to establish that

respondent has serious difficulty controlling his sexually violent behavior.  We initially note that

although the jury is not required to make an explicit finding that respondent has serious difficulty

controlling his sexual behavior (*In re Detention of Varner*, 207 Ill. 2d 425, 432-33 (2003)), such a

finding is implicit in the jury's verdict in this case that respondent is a sexually violent person.

This court has noted that "the Act contains a volitional component in (1) its definition of 'mental

disorder' as 'a congenital or acquired condition affecting the emotional or volitional capacity that

predisposes a person to engage in acts of sexual violence' (725 ILCS 207/5(b) (West 2000)); and

(2) its required finding that it is 'substantially probable' that the respondent will engage in future

acts of sexual violence." *In re Commitment of Stevens*, 345 Ill. App. 3d 1050, 1062 (2004).

Based upon these volitional components, this court has also held that, in finding that someone is

dangerous because he suffers from a mental disorder that makes it substantially probable that he

will engage in future acts of sexual violence, the jury is necessarily required to find that the person

lacks volitional control over his mental disorder.  See, *e.g.*, *In re Detention of Trevino*, 317 Ill.

21

App. 3d 324, 335-36 (2000); *Tittlebach*, 324 Ill. App. 3d at 14.

We also find that there was sufficient evidence presented at trial to support a finding that respondent lacks volitional control over his mental disorders. Initially, Dr. Leavitt's testimony alone was sufficient to support this conclusion. Dr. Leavitt diagnosed respondent with paraphilia nos, cannabis abuse, and antisocial and narcissistic personality disorders. Dr. Leavitt testified that respondent's paraphilia affects his emotional and volitional capacity and predisposes him to commit future acts of sexual violence, and explained that respondent's other disorders act as disinhibiting influences that make it easier for him to commit sexually violent acts. According to Dr. Leavitt, respondent has refused to undergo treatment for his paraphilia, which is the only way to control that disorder, and shows a lack of empathy for his victims and a lack of remorse for his actions. In addition to his clinical judgment, Dr. Leavitt used actuarial instruments to confirm his opinion that respondent's mental disorders create a substantial probability that he will engage in future acts of sexual violence. Considering all of this testimony, we find that a jury could reasonably conclude that respondent has serious difficulty controlling his sexually violent behavior.

Dr. Buck's testimony also supports a finding that respondent has serious difficulty controlling his sexual behavior. Dr. Buck found that respondent suffers from the same disorders as were diagnosed by Dr. Leavitt, and she testified that those disorders impact respondent's emotional and volitional capacity and predispose him to commit future acts of sexual violence. Dr. Buck also noted that respondent has refused to undergo treatment for his disorders and that he lacks empathy for his victims. She added that respondent has refused to accept responsibility

22

for his criminal offenses and that he blames his convictions on overzealous prosecutors and mistaken identity. Dr. Buck concluded that respondent's mental disorders make it substantially probable that he will commit future acts of sexual violence. Although Dr. Buck testified that respondent has volitional control, the jury was free to accept or reject as much or as little of her testimony as it saw fit. See *People v. McDonald*, 329 Ill. App. 3d 938, 947 (2002) (jury is free to accept the opinion of one expert witness over another or accept part and reject part of each expert's testimony); *People v. Cosme*, 247 Ill. App. 3d 420, 428 (1993) (trier of fact is free to accept or reject all or part of a witness' testimony).

Moreover, Dr. Buck's testimony that respondent made a volitional choice to commit his sexual offenses does not preclude his commitment under the Act. See *Traynoff*, 358 Ill. App. 3d at 441. Dr. Buck testified that respondent is "free to do what he wants," in that he committed his sexual offenses intentionally and made a volitional choice to execute them. Respondent seems to interpret this testimony to mean that he is able to control his sexually violent behavior and that, in effect, he could make a volitional choice to never again commit a sexually violent offense. However, such a conclusion does not follow from Dr. Buck's testimony. The mere fact that respondent intentionally committed his sexual offenses does not mean that he has the volitional capacity to choose not to commit them. Dr. Buck never offered such an opinion and in fact testified that there is a substantial probability that respondent will commit a future act of sexual violence. In this regard, Dr. Buck explained that respondent's mental disorders "warp his perceptions and his feeling and allow him to exhibit sexually assaulting behavior." Dr. Buck further explained that she was not aware of a means of measuring volitional capacity and that

psychologists do not measure volitional control as "high, low, up, [or] down." Rather, in Dr. Buck's expert opinion, respondent's mental disorders impact his emotional and volitional capacity and predispose him to commit acts of sexual violence. We conclude that Dr. Buck's statements regarding respondent's volitional control, when considered in context of her entire testimony, do not undermine the jury's verdict that respondent is a sexually violent person. See *Varner*, 207 Ill. 2d at 432-33 (rejecting a claim that the constitution required a specific determination by the fact finder that a person lacks volitional control and concluding that the Act "contain[s] definitions that supply the constitutionally required elements for civil commitment," and "[a] fact finder properly instructed with definitions of these and other pertinent statutory terms need not receive additional separate instruction on lack of control").

We disagree with respondent that Dr. Leavitt concurred with Dr. Buck's testimony that respondent has volitional control. Respondent's claim is based on Dr. Leavitt's testimony that, by not sexually assaulting anyone while in prison, respondent demonstrated that he could control his behavior under certain circumstances. However, Dr. Leavitt further explained that it was important to consider that respondent was incarcerated within a correctional facility during this time. Dr. Buck similarly noted that the DOC is a "controlled environment" that goes "out of [its] way" to protect its female workers. Under these circumstances, we do not read Dr. Leavitt's testimony to indicate that respondent has volitional control over his mental disorders or his sexually violent behavior.

Respondent also claims that the State failed to prove beyond a reasonable doubt that he suffers from a mental disorder and that he is dangerous because that disorder creates a substantial

24

probability that he will engage in future acts of sexual violence. Respondent asserts that the testimony of the State's experts was inconsistent and unsupported by admissible evidence, and therefore insufficient to sustain the jury's verdict. We disagree.

The Act defines a mental disorder as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 1998). In this case, Dr. Buck and Dr. Leavitt testified that respondent suffers from paraphilia nos, a congenital or acquired disorder that affects his emotional or volitional capacity and predisposes him to commit future acts of sexual violence. Dr. Buck and Dr. Leavitt also diagnosed respondent with cannabis abuse and narcissistic and antisocial personality disorders. Both witnesses concluded that respondent's mental disorders create a substantial probability that he will engage in future acts of sexual violence. We conclude that this testimony was sufficient to support the jury's finding that respondent suffers from a mental disorder and that he is dangerous because that disorder creates a substantial probability that he will engage in future acts of sexual violence. See *Tittlebach*, 324 Ill. App. 3d at 11-12 (expert testimony that the respondent had a mental disorder, pedophilia, that made it substantially probable that he would commit sexually violent acts in the future was sufficient to prove beyond a reasonable doubt that the respondent was a sexually violent person); *Stevens*, 345 Ill. App. 3d at 1061 (expert testimony that the respondent's mental disorders, including paraphilia, antisocial personality disorder, and substance dependency, caused him to be more likely to reoffend sufficient to support that the jury's finding that the respondent's mental disorders made it substantially probable that he would engage in future acts of sexual violence).

25

Respondent nevertheless argues that the testimony of the State's experts is entitled to no weight and should be disregarded because: (1) their opinions and diagnoses did not meet the diagnostic criteria of the DSM; (2) they relied solely upon his past crimes to diagnose him with paraphilia; (3) they relied upon anecdotal information about his behavior while incarcerated and ignored affirmative evidence about his normal functioning in prison; (4) they claimed that respondent's current confinement satisfied the DSM's requirement for a paraphilia diagnosis of current distress or disability; and (5) Dr. Buck rejected the DSM requirement of a pervasive pattern of conduct and recurrent presentation of symptoms and admitted that respondent is not mentally ill, that she was unaware that he has any recurrent, intense sexually arousing fantasies or sexual urges, and that he has not engaged in nonconsensual sexual activity in 26 years. Respondent further argues that reasonable doubt was created because the State's experts relied solely upon actuarial instruments to conclude that there was a substantial probability that he would engage in future acts of sexual violence.

We find that respondent's claims amount to no more than an attack on the credibility of the witnesses and the weight to be given to their testimony. In considering a challenge to the sufficiency of the evidence, it is not the function of this court to reweigh the evidence or retry respondent. *In re Detention of Erbe*, 344 Ill. App. 3d 350, 373 (2003); *Tittlebach*, 324 Ill. App. 3d at 11. Rather, the trier of fact, in this case the jury, is responsible for assessing the witnesses' credibility, weighing the testimony, and drawing reasonable inferences from the evidence. *Tittlebach*, 324 Ill. App. 3d at 11. In this case, the record establishes that, at trial, respondent explored all of the alleged inadequacies in Dr. Buck's and Dr. Leavitt's opinions during a vigorous

cross-examination of both witnesses and through the testimony of his own expert witnesses. See *Erbe* 344 Ill. App. 3d at 372 (noting that traditional methods, such as cross-examination and rebuttal witnesses, offered respondent the opportunity to challenge the State's experts' opinions in the proper forum - during trial in front of the jury). In finding respondent to be a sexually violent person, the jury in this case implicitly found the testimony of Dr. Buck and Dr. Leavitt to be more credible and, after reviewing the record, we find no valid reason to substitute our judgement for that of the trier of fact. See *Tittlebach*, 324 Ill. App. 3d at 11.

Moreover, we note that Dr. Buck and Dr. Leavitt did not rely solely upon respondent's past crimes or actuarial instruments in arriving at their opinions. Either one or both witnesses also relied upon clinical judgment, a clinical interview with respondent, respondent's mental-disorder diagnoses and refusal to undergo treatment, and a review of respondent's master file, which included prior mental health evaluations by DOC and DHS personnel and documents relating to respondent's disciplinary history and behavior while incarcerated and in civil detention.

In conclusion, we find that there was more than sufficient evidence to support the jury's finding that respondent is a sexually violent person, and we therefore reject his claim that he is entitled to judgment notwithstanding the verdict.

Respondent next claims that the trial court abused its discretion by admitting evidence of the details of his past crimes, including those of which he was never convicted. Specifically, respondent claims that the court erred by allowing the State to describe his past crimes in detail during opening and closing statements, the direct examination of Dr. Buck, and the cross-examination of Dr. Leavitt. Respondent acknowledges that, under the Act, the State must prove

that he has been convicted of a sexually violent offense, but argues that certified copies of his convictions would have sufficiently satisfied the State's burden and that he was severely prejudiced by the admission of evidence of his past crimes.

Respondent's arguments is based on *People v. Winterhalter*, 313 Ill. App. 3d 972, 979 (2000), where the court held that it was error for the trial court to permit a victim to testify regarding the details of the respondent's crime in order to prove that he had been convicted of a sexually violent offense. In so holding, the court noted that the State could sufficiently prove that element by the introduction of a certified copy of the respondent's conviction, and that such details "would be admissible only if relevant to the remaining issues of whether the person has a mental disorder and is dangerous to others because the person's mental disorder creates a substantial probability that he or she will engage in acts of sexual violence." *Winterhalter*, 313 Ill. App. 3d at 979.

While we agree with the principle articulated in *Wintenhalter*, we note that, in this case, the State did not discuss or elicit testimony regarding the details of respondent's past crimes in order to prove that respondent had been convicted of a sexually violent offense. Rather, consistent with the holding in *Wintenhalter*, the record shows that the State proved that element by introducing certified copies of respondent's convictions.

Moreover, it is the trial court's responsibility to weigh the probative value and potential prejudicial effect of evidence, and the court's decision will not be reversed absent an abuse of that discretion. *Wintenhalter*, 313 Ill. App. 3d at 978. For the reasons that follow, we find that the trial court did not abuse its discretion by allowing the State to elicit testimony regarding the details

28

of respondent's past crimes.

Respondent first maintains that the court abused its discretion by allowing the State to describe the details of respondent's past crimes during opening and closing statements. The record shows that, during opening and closing statements, the State told the jury that Dr. Buck and Dr. Leavitt relied upon the facts of respondent's past criminal actions to arrive at their opinions, and discussed how respondent gained access to his victim's homes and the manner in which he committed his subsequent sexual offenses. The record also shows, however, that respondent did not object to these descriptions during the State's opening or closing statement. Moreover, although respondent argued in his posttrial motion that the court erred by allowing the State to elicit details of the underlying crimes, respondent's argument focused on when these details were elicited during witness testimony and made no mention of this alleged error in the context of opening and closing arguments. It is well settled that the failure to make a timely objection at trial and renew that objection in a written posttrial motion results in the waiver of the right to raise the issue on appeal. *People v. Herrett*, 137 Ill. 2d 195, 209 (1990); *People v. Enoch*, 122 Ill. 2d 176, 187 (1988). Accordingly, we find that respondent's claim regarding opening and closing statements is waived.

Respondent also complains that the trial court abused its discretion in allowing Dr. Buck to testify regarding the details of respondent's past sexual crimes. Respondent claims that such testimony served only to inflame the jury and was unnecessary for Dr. Buck's diagnosis of paraphilia nos. We disagree.

In this case, Dr. Buck testified to the facts surrounding each of respondent's rape

convictions and to facts from cases in which respondent was arrested and charged with a sexually related offense. Dr. Buck also testified that she relied upon these facts in evaluating respondent and reaching her expert opinions. An expert witness may properly testify to facts upon which her opinion is based (*In re Detention of Isbell*, 333 Ill. App. 3d 906, 913 (2002)), and we therefore find nothing improper in Dr. Buck's testimony in this regard. Moreover, the record shows that prior to Dr. Buck's testimony, the trial court instructed the jury that the details of respondent's past crimes were being admitted to aid the jury in understanding the basis of Dr. Buck's opinion and not to prove the truth of the matter asserted. There is a strong presumption that jurors follow the instructions given by the court (*People v. Harris*, 288 Ill. App. 3d 597, 605 (1997)), and nothing in the record rebuts that presumption. Under these circumstances, we find that the trial court did not abuse its discretion by allowing Dr. Buck to testify regarding the details of respondent's past crimes. See *Isbell*, 333 Ill. App. 3d at 914 (finding that, even absent a limiting instruction, trial court did not abuse its discretion in allowing State's experts to testify about facts underlying the respondent's sexual crimes where the experts testified that they relied upon those facts in forming their opinions).

Finally, respondent argues that the trial court abused its discretion by allowing the State to mention details of his past crimes during its cross-examination of respondent's expert witness, Dr. Lytton. The scope of cross-examination lies within the sound discretion of the trial court, and the court's ruling will not be overturned abuse a clear abuse of that discretion. *People v. Foster*, 322 Ill. App. 3d 780, 785 (2000).

During its cross-examination of Dr. Lytton, the State essentially summarized the facts from

respondent's past crimes, including each of his rape convictions, and asked Dr. Lytton whether she had considered them in arriving at her opinions. The trial court overruled respondent's objection to this line of questioning, stating that it was proper to cross-examine Dr. Lytton about these facts because they went to the credibility of her expert opinions. Respondent now claims that the State's questioning was beyond the scope of Dr. Lytton's direct examination and for the sole purpose of showing that he engaged in sexual behavior with nonconsenting persons which, respondent asserts, was already a stipulated fact.

After reviewing the record, we find nothing improper in the State's cross-examination of Dr. Lytton. During cross-examination, counsel is permitted to probe the weaknesses in the bases of an expert's opinion as well as the general soundness of that opinion. *Stevens*, 345 Ill. App. 3d at 1061. In this case, Dr. Lytton testified that she relied upon respondent's past crimes in arriving at her opinions in this case. Because Dr. Lytton relied upon those cases in arriving at her opinions, we conclude that it was entirely proper for the State to question her about the facts from those cases and whether they were consistent with her opinions. Accordingly, we find that the trial court did not abuse its discretion in allowing the State to cross-examine Dr. Lytton about the details of respondent's sexual crimes.

Respondent next contends that the trial court abused its discretion by excluding the expert testimony of Dr. Robert Kinscherff. The decision of whether to allow expert testimony is committed to the sound discretion of the trial court, and the court's decision will not be reversed absent an abuse of that discretion. *Sinclair v. Berlin*, 325 Ill. App. 3d 458, 469 (2001). An individual will be permitted to testify as an expert if his experience and qualifications afford him

31

knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion. *People v. Mertz*, 218 Ill. 2d 1, 72 (2005).

The record shows that the State objected when respondent attempted to call Dr. Kinscherff to testify and that the trial court allowed respondent to elicit from Dr. Kinscherff his proposed testimony in order to make an offer of proof. Dr. Kinscherff testified that as psychologists, Dr. Buck and Dr. Leavitt had a professional obligation to disclose the limitations of the actuarial tools and other data upon which they relied. According to Dr. Kinscherff, this professional obligation or code of conduct derive from the APA code of ethics as well as guidelines established by the ATSA and "Division 41."

Following the *voir dire*, the trial court barred Dr. Kinscherff's testimony on three grounds. First, his testimony would prejudice the State because, in his deposition, Dr. Kinscherff stated that he had not reviewed Dr. Leavitt's report for ethical improprieties. Second, because the State's case relied upon Dr. Buck's and Dr. Leavitt's trial testimony and not their written reports, Dr. Kinscherff's testimony regarding those written reports would not have aided the jury. Finally, the court concluded that Dr. Kinscherff's testimony was cumulative to the testimony offered by the other witnesses.

Respondent claims that the trial court's ruling was erroneous. Specifically, respondent asserts that the jury could have concluded that Dr. Buck and Dr. Leavitt violated their professional duty to disclose the limits of the actuarial tools and data upon which they relied because their testimony was "replete with undisclosed errors," and that Dr. Kinscherff's testimony would have given the jury a benchmark by which to judge the witnesses' credibility.

1-06-1272

Upon review, we find that the trial court did not abuse its discretion by barring Dr. Kinscherff's testimony for the following reasons. First, we find that the trial court properly barred Dr. Kinscherff's testimony regarding Dr. Leavitt based on respondent's failure to comply with discovery rules. Supreme Court Rule 213(g) (210 Ill. 2d R. 213(g)) requires parties to disclose, among other things, the opinions and conclusions of all witnesses offering opinion testimony. *Sinclair v. Berlin*, 325 Ill. App. 3d 458, 469 (2001). An expert's testimony must be consistent with and is limited to the scope of opinions disclosed during discovery. *Sinclair*, 325 Ill. App. 3d at 469. The determination of an appropriate sanction for a discovery violation lies within the trial court's discretion. *People v. Mullen*, 313 Ill. App. 3d 718, 736 (2000).

Respondent claims that Dr. Kinscherff's opinions regarding Dr. Leavitt were disclosed well in advance of trial and were therefore improperly excluded. However, the only citation made in support of this claim is to a series of pages in the trial transcript where respondent's counsel is arguing to the court that Dr. Kinscherff's opinions were disclosed during discovery. Respondent has failed to cite to any other pages of the record to support his contention, and his failure to do so results in waiver of this argument on appeal. See *Elder v. Bryant*, 324 Ill. App. 3d 526, 533 (2001) (failure to properly present an issue or cite to pages of the record relied upon violates Supreme Court Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7)) and results in waiver of their contention on appeal).

Additionally, in the aforementioned section of the record cited by respondent, the State reads into the record a portion of Dr. Kinscherff's deposition testimony in which he states that he had not reviewed Dr. Leavitt's deposition and that he was not asked to consider Dr. Leavitt's

33

work for ethical violations. Regardless, respondent has not cited to Dr. Kinscherff's deposition and we have been unable to locate the deposition in the record. It is not our responsibility to scour the record in order to reverse the trial court's judgment. *In re G.W.*, 357 Ill. App. 3d 1058, 1061 (2005). Moreover, respondent has the burden of providing a sufficiently complete record to support a claim of error (*Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984)), and absent such a record we will presume that the trial court's ruling had a sufficient factual basis (*Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 156 (2005)). Here, where we do not have a sufficient record to determine whether Dr. Kinscherff's opinions regarding Dr. Leavitt were properly disclosed, we will presume that the trial court had a sufficient basis upon which to conclude that they were not and we therefore find that the court did not err by precluding Dr. Kinscherff from testifying on that basis.

Moreover, we find that Dr. Kinscherff's testimony would have been cumulative. The trial court has discretion to bar an expert from testifying if the expert's testimony would be cumulative. *Kotvan v. Kirk*, 321 Ill. App. 3d 733, 748-49 (2001). Here, although respondent frames his contention in terms of Dr. Buck's and Dr. Leavitt's professional obligations, we find his argument to be no more than a recasting of his previous attack on the credibility of these witnesses and the weight to be given to their testimony. Our review establishes that the substance of Dr. Kinscherff's testimony would have dealt with the alleged errors and limitations in Dr. Buck's and Dr. Leavitt's diagnoses and use of actuarial tools, which are all issues that were fully explored at trial through the testimony of the other witnesses. Moreover, Dr. Leavitt testified that the ATSA advises psychologists to discuss the limits of any conclusions that are not based on personal

interviews, and Dr. Buck testified that the ATSA advises psychologists to use multiple sources of information when making evaluations. Under these circumstances, we find that the trial court did not abuse its discretion in concluding that Dr. Kinscherrff's testimony would have been cumulative.

Respondent further contends that the trial court abused its discretion by denying his motion for a new trial. Respondent asserts that the jury's verdict was against the manifest weight of the evidence because the opposite conclusion, that he is not a sexually violent person, is clearly evident. However, respondent's contention is no more than a reiteration of his previous claim that he is entitled to judgment notwithstanding the verdict. We have already rejected that claim and found that there was sufficient evidence upon which the jury could reasonably find that respondent is a sexually violent person. We find that conclusion dispositive of respondent's current contention and, accordingly, we find no abuse of discretion in the trial court's denial of respondent's motion for a new trial.

Respondent next contends that the trial court abused its discretion by ordering him confined for institutional care in a secure facility. Respondent asserts that the trial court relied heavily upon the "flawed" testimony of Dr. Buck and Dr. Leavitt and ignored undisputed evidence that he is an appropriate candidate for conditional release. Specifically, respondent argues that he should be have been conditionally released because his crimes occurred over 26 years ago, he has behaved well while in custody and, if released, he would live with his fiancée, be gainfully employed as law clerk and undergo treatment.

Section 40(a) of the Act provides that, when a person is found to be a sexually violent person, the court "shall order the person to be committed to the custody of the [DHS]." 725 ILCS

207/40(a) (West 2006). Section 40(b)(2) of the Act provides that the order of commitment shall specify either institutional care in a secure facility or conditional release. 725 ILCS 207/40(b)(2) (West 2006). In making this determination, the court may consider (1) the nature and circumstances of the behavior that was the basis of the allegations in the State's petition; (2) the person's mental history and present mental condition; (3) where the person will live; (4) how the person will support himself; and (5) what arrangements are available to ensure that the person has access to and will participate in necessary treatment. 725 ILCS 207/40(b)(2) (West 2006). We review the trial court's decision to commit respondent to a secure facility under an abuse of discretion standard. *Erbe*, 344 Ill. App. 3d at 374. An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *Erbe*, 344 Ill. App. 3d at 374.

In this case, the record shows that the trial court heard and considered evidence pertaining to all of the relevant factors prior to ordering respondent committed to a secure facility. Dr. Buck and Dr. Leavitt testified that respondent suffered from mental disorders that made it substantially probable that he would engage in future acts of sexual violence. Moreover, the record establishes that respondent has refused to acknowledge his past sexual offenses or undergo treatment for his mental disorders. Although respondent points to evidence that he claims warrants his conditional release, the record shows that the trial court was presented with and considered all of this evidence, and on review, we will not reweigh the relevant factors or substitute our judgement for that of the trial court. See *Erbe*, 344 Ill. App. 3d at 374. Here, considering all of the evidence before the trial court, including the testimony of the State's expert witnesses, the nature and

circumstances of respondent's behavior, the jury's finding regarding respondent's mental conditions, and respondent's refusal to undergo treatment or acknowledge his past criminal offenses, we cannot say that the court abused its discretion in ordering respondent committed to a secure facility. See *Tittlebach*, 324 Ill. App. 3d at 13 (trial court did not abuse its discretion in ordering respondent committed to a secure facility where experts testified that respondent's mental disorders made it substantially probable that he would commit future acts of sexual violence and respondent never participated in treatment while incarcerated).

In reaching this conclusion, we note that respondent's claim that he does not suffer from a mental disorder and his challenge to the contrary testimony of Dr. Buck and Dr. Leavitt amounts to an attack on the credibility of the State's expert witnesses and the weight to be given to their testimony. As previously noted, the duty of evaluating the evidence and determining the credibility of the witnesses lies with the trier of fact and not the reviewing court. *Erbe*, 344 Ill. App. 3d at 374 (rejecting respondent's claim that the court erred in relying on the "questionable" testimony of the State's expert witnesses in committing him to institutional care as an attack on the credibility of the witnesses and noting that such determinations are properly made by the trial court and not the reviewing court).

Respondent's final contention is that the trial court erred in denying the renewed motion to dismiss based upon a corrected release date. Respondent claims that, because the circuit court ordered he receive 1,004 days of pretrial credit in People v. Lieberman, No. 80 C 208 (Cir. Ct. Cook Co.), his correct release date from the DOC should have been April 10, 1997, not January 9, 2000. Therefore, because the Act did not become effective until January 1, 1998, respondent

37

asserts that it does not apply to him and the trial court should have dismissed the State's petition.

We find that respondent has waived this contention by failing to comply with Supreme Court Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7)). Supreme Court Rule 341(h)(7) requires appellant's brief to include " '[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on.' " *Salgado v. Marquez*, 356 Ill. App. 3d 1072, 1074 (2005), quoting 210 Ill. 2d R. 341(h)(7). " '[A] reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research.' " *In re Marriage of Auriemma*, 271 Ill. App. 3d 68, 72 (1994), quoting *Thrall Car Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986). An issue not clearly defined and sufficiently presented fails to satisfy the requirements of Supreme Court Rule 341(h)(7) and is, therefore, waived. *Vincent v. Doebert*, 183 Ill. App. 3d 1081, 1087 (1989).

In this case, respondent has failed to adequately cite to the record or pertinent authority or to explain the basis of his conclusion that his release date should be April 10, 1997. His argument in this regard consists of one paragraph, and it is insufficient upon which to verify his claims. It appears that, in his reply brief, respondent attempts to further explain this issue by noting that his release date was scheduled to be January 2003 and that, in addition to the 1,004 days of pretrial credit, he also earned 1,155 days of "Meritorious Good Time (MGT) credit." We find that these points are waived because respondent did not raise them in his opening brief. See 210 Ill. 2d R. 341(h)(7) ("Points not argued [in the opening brief] are waived and shall not be raised in the reply

brief"); *Epstein v. Chicago Board of Education*, 178 Ill. 2d 370, 384-85 (1997). Moreover, respondent does not cite to the record to support his statement that he earned 1,155 days of MGT credit, and we are therefore unable to determine the veracity of this claim. We note that the record does contain a decision of the Second District of the this court affirming the judgment of the circuit court of Cook County denying his request for 1,150 days of MGT credit. See *Lieberman v. Peters*, No. 2-96-0196 (1996) (unpublished order pursuant to Supreme Court Rule 23). In that case, the court found that respondent failed to present any proof in support of his claim and affirmed the circuit court's findings that respondent had not proven by clear and convincing evidence that he earned 1,150 days of MGT credit and that his testimony was not substantiated by an written documents except for one memorandum which was forged. *Lieberman*, slip op. at 4. Because of respondent's failure to adequately present this issue, we cannot determine if this decision involves the same MGT credit that respondent is now claiming. In conclusion, due to respondent's failure to comply with Rule 341, we find that he has waived the contention that the trial court erred by denying his renewed motion to dismiss.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Judgment affirmed.

J. GORDON and O'MALLEY, JJ., concur.