*In re* DETENTION OF GARY WELSH (The People of the State of Illinois, Petitioner-Appellee, v. Gary Welsh, Respondent-Appellant).

Second District   No. 2—08—0064

Opinion filed August 6, 2009.

David J. Giesinger, of Woodstock, for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Michael M. Glick and Leah Myers Bendik, Assistant Attorneys General, of counsel), for the People.

JUSTICE JORGENSEN delivered the opinion of the court:

In 1973, respondent, Gary Welsh, was convicted of murdering a three-year-old girl and was sentenced to 60 to 100 years' imprisonment. In December 2004, two days before respondent was scheduled to be released from prison, the State petitioned to adjudicate

respondent a sexually violent person under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2004)).[1] The trial court found probable cause to believe that respondent was a sexually violent person and ordered his detention until trial. Respondent's motion to dismiss the petition was denied. After a three-day bench trial, the trial court found respondent to be a sexually violent person and, on January 16, 2008, following a dispositional hearing, committed respondent to the custody of the Department of Human Services. Respondent appeals, arguing that: (1) the trial court erred in denying his motion to dismiss, because his murder conviction did not constitute a sexually violent offense as defined by the Act; and (2) the State did not establish beyond a reasonable doubt that he is a sexually violent person. For the following reasons, we affirm.

## I. BACKGROUND

Respondent was charged with the September 29, 1962, rape (Ill. Rev. Stat. 1961, ch. 38, par. 11—1) and murder (Ill. Rev. Stat. 1961, ch. 38, par. 9—1) of a three-year-old girl. He was apprehended immediately following the crime, and that same day, he made oral and written confessions. Respondent was found unfit for trial and spent approximately 10 years in mental health facilities in Chester and Elgin. After being restored to fitness, respondent was tried before a jury. On April 30, 1973, respondent was acquitted of rape, but convicted of murder. On June 26, 1973, the trial court sentenced respondent to 60 to 100 years' imprisonment.

According to Dr. Michael Fogel, director of the Department of Corrections' (DOC's) sex offender evaluation unit from 2003 through 2005, in 2002, respondent's name appeared on a computer-generated list within the unit. The unit is "responsible for screening all sex offenders who ha[ve] committed a sexually violent offense per statute under the [Act], and making a determination as to whether or not they should be referred to the Attorney General's Office and the State's Attorney's office." The generated list named inmates who had

---

[1]The Act, which applies to individuals who have been convicted of a "sexually violent offense" (725 ILCS 207/5(f) (West 2004)) and who are nearing release or discharge from custody, permits the State to extend the incarceration of a defendant beyond the time he or she would otherwise be released if the defendant is found to be sexually violent. *In re Detention of Samuelson,* 189 Ill. 2d 548, 552 (2000). If a person is determined to be sexually violent, the Act authorizes involuntary civil commitment for "control, care and treatment until such time as the person is no longer a sexually violent person." 725 ILCS 207/40(a) (West 2004). Proceedings under the Act are civil, not criminal. 725 ILCS 207/20 (West 2004).

committed a sexually violent offense or murder. The inmates who had murder convictions appeared on the list for a determination by the unit of whether the murder was sexually motivated. Based on the list, which was generated approximately three months prior to the inmates' release, the unit decided "who to follow up on," screened the appropriate files, and then, if necessary, interviewed the inmate and conducted an evaluation. Typically, the unit interviewed only about 3% of the individuals whose names appeared on the list. The unit then issued a report assessing the appropriateness of referring the inmate to the Attorney General, for consideration as a sexually violent person.

When respondent's name appeared on the 2002 list, the unit screened his file. Dr. Anthony Shaub, Dr. Fogel's predecessor as director of the unit, determined that it was not necessary to interview respondent and "cleared" him, meaning no additional testing or psychological evaluations were ordered. Thus, Dr. Shaub concluded that respondent was not appropriate for possible civil commitment under the Act and did not refer respondent to the Attorney General's and State's Attorney's offices.

The unit took no further action regarding respondent until 2004 when, on November 10, 2004, Dr. Fogel received a request from the Attorney General's office that respondent be reevaluated. Dr. Fogel reviewed respondent's DOC master file, which included court records, mental health evaluations, presentence investigation reports, medical records, and other criminal records. Dr. Fogel interpreted the Attorney General's instructions as a request that respondent be interviewed, so he also performed an actuarial assessment and interviewed respondent. Like Dr. Shaub, Dr. Fogel concluded that respondent should not be referred to the Attorney General's and State's Attorney's offices as warranting action under the Act.

On November 22, 2004, the Attorney General's office retained Dr. Henry Lahmeyer, a clinical and forensic psychiatrist, to evaluate respondent for purposes of possible civil commitment under the Act. The Attorney General's office informed Dr. Lahmeyer that there was not enough time for him to interview respondent (presumably before respondent was released from custody). On December 1, 2004, after reviewing various documents, Dr. Lahmeyer concluded to a reasonable degree of psychiatric certainty that respondent is a sexually violent person subject to civil commitment under the Act.

## A. Petition for Adjudication

The next day, December 2, 2004, attaching and incorporating Dr. Lahmeyer's report, the Attorney General and the McHenry County State's Attorney jointly petitioned to have respondent adjudicated a

sexually violent person. 725 ILCS 207/15(a) (West 2004). The petition asserted that respondent was convicted in 1973 of the "sexually violent offense" of "murder, sexually motivated." The petition further alleged:

"On June 26, 1973, the [r]espondent was convicted of the offense of Murder and sentenced to 60-100 years in the Illinois Department of Corrections. This offense was sexually motivated. On September 29, 1962, the [r]espondent, while babysitting his 3-year-old female victim, attempted to calm her by laying [sic] next to her. As he did so, his penis became erect. He attempted, by force, to vaginally penetrate his 3-year-old victim with his erect penis. His attempt was unsuccessful. He then rolled the 3-year-old onto her stomach and anally penetrated her, by force, with his penis. During the forced anal penetration, the 3-year-old victim cried out. The respondent reacted to his victim's cries by forcefully pushing her face into a pillow as he anally penetrated her, thereby causing her death. It was later determined that [the] 3-year-old victim died as a result of asphyxiation."

The petition further alleged that respondent, when he was 13 years old and living in Iowa, molested his 10-year-old female cousin and sexually assaulted his younger sister. Also, in 1958, he was committed to an Iowa mental institution.

The petition asserted, based upon Dr. Lahmeyer's conclusions, that respondent possessed the following mental disorders as defined by the Diagnostic and Statistical Manual of the American Psychiatric Association, fourth edition (DSM-IV): (1) pedophilia; (2) alcohol dependency—enforced remission; (3) antisocial personality disorder; and (4) factitious disorder—mental retardation. Finally, the petition concluded that respondent "is dangerous because he suffers from mental disorders that make it substantially probable that he will engage in acts of sexual violence." The State requested that the court commit respondent to the care and custody of the Department of Human Services until such time as he is no longer a sexually violent person.

## B. Probable-Cause Hearing

On December 6, 2004, the trial court held a probable-cause hearing on the petition. 725 ILCS 207/30(b) (West 2004). The State presented the sole witness, Dr. Lahmeyer, who testified to the findings and conclusions in his report. Specifically, after being qualified as an expert witness, Dr. Lahmeyer explained that, on November 23, 2004, he was asked to evaluate respondent. As part of his evaluation, Dr. Lahmeyer reviewed various documents, including: (1) police reports; (2) previous psychiatric evaluations; (3) the psychological test report

issued by Dr. Fogel in November 2004; (4) respondent's correspondence with the State's Attorney's office; and (5) other materials. Dr. Lahmeyer did not interview respondent. Dr. Lahmeyer testified that respondent's 1962 murder was "absolutely" sexually motivated and that, based upon his review of the documents, respondent had engaged in additional sexual offenses before the murder, including "rapes" of his two sisters and sexual assault of his cousin. He noted that the records reflected that respondent was committed to a psychiatric facility in Iowa when he was about 15 years old.

Dr. Lahmeyer recounted the diagnoses rendered by evaluators who had previously examined respondent. He testified that previous evaluators had labeled respondent "psychotic," "a mental defective," and "a high level mental defective." When asked whether any diagnosis had been made regarding a sexual attraction to children, Dr. Lahmeyer said "yes"; when asked to specify, he explained that he did not know if it was specified other than that the documents reflected that respondent was sexually attracted to children, based on "repeated offenses and current thinking."

Dr. Lahmeyer concluded that respondent suffers from four disorders as described by the DSM-IV: (1) pedophilia; (2) antisocial personality; (3) factitious disorder; and (4) chronic alcohol dependence. Specifically, regarding pedophilia, Dr. Lahmeyer testified that respondent, as a minor and an adult, had displayed sexual misbehavior with minors—when he raped his 14-year-old sister, he was more than six years older than she was, and he was an adult when he raped the 3-year-old girl. Dr. Lahmeyer explained that pedophilia is not a disorder that disappears on its own.

As to antisocial personality disorder, respondent displayed that disorder in that he committed multiple crimes in different settings. For example, in addition to the murder conviction, respondent was once convicted of check forgery and driving under the influence of alcohol. According to Dr. Lahmeyer, respondent also stated in several evaluations that he became intoxicated every weekend and was guilty, but not convicted, of assault and battery. Dr. Lahmeyer further explained that respondent displayed a lack of remorse for his crimes and a complete disregard for the safety of others.

Regarding factitious disorder (a deliberate falsification of physical or mental illness), Dr. Lahmeyer explained that respondent reflects this disorder in two ways. First, respondent claimed to have head injuries, "spells," "nerves," and/or blackouts during his sex acts and the murder. According to Dr. Lahmeyer, these assertions are not credible; respondent does not in any way meet the criteria for suffering alcoholic blackouts, and when respondent was hospitalized in Iowa, he

exhibited no signs of blackouts and his EEG and X rays were normal. Second, Dr. Lahmeyer testified that the records reflected that, when respondent was being treated at mental institutions (before his murder trial), he appeared to feign mental incompetence until he realized that if he did not become competent, he could be held in the mental institutions indefinitely. Thereafter, respondent apparently decided to "change" his competence and stand trial. Respondent scored in the normal range on an "Intelligence Quotient" (IQ) test; thus, Dr. Lahmeyer concluded that when respondent previously scored lower than the normal range on other IQ tests, he was not giving his full effort.

Finally, Dr. Lahmeyer diagnosed respondent as suffering chronic alcoholism in remission, because respondent testified at his trial that he began drinking daily at age 10, and that, when he started drinking, he could not stop until he got into a violent fight or passed out. Respondent apparently testified at his murder trial that he had been drinking "at the time I raped my sister." Respondent had been drinking the night of the murder of the three-year-old. According to Dr. Lahmeyer, respondent meets the criteria of chronic alcohol addiction, but the alcoholism is in remission because respondent does not have ready access to alcohol while imprisoned. Dr. Lahmeyer testified that respondent did not seek or receive any formal substance abuse treatment while incarcerated.

According to Dr. Lahmeyer, the foregoing disorders "definitely" meet the definition of a congenital or acquired condition affecting one's emotional or volitional capacity and predisposing one to engage in acts of sexual violence. Dr. Lahmeyer looked at empirically based risk factors and relied upon his clinical judgment to reach his opinion that it is substantially probable that respondent will commit future acts of sexual violence. In addition, Dr. Lahmeyer found respondent's lack of substance-abuse and sex-offender treatment significant to his opinion that respondent was substantially probable to commit future acts of sexual violence.

The trial court found probable cause to believe that respondent is a sexually violent person. The court took judicial notice of a certified statement of respondent's murder conviction and noted that Dr. Lahmeyer testified that the murder was sexually motivated and that respondent had a history of sexual offenses. Pursuant to section 30(c) of the Act, the court remanded respondent to DOC custody for a transfer to a detention facility approved by the Department of Human Services and ordered an evaluation as to whether respondent is a sexually violent person. 725 ILCS 207/30(c) (West 2004). The court continued the matter for further proceedings.

## C. Motion to Dismiss

On January 12, 2005, respondent moved, pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 2004)), to dismiss the petition for sexually violent person adjudication. Respondent argued that only first degree murder, not murder, is included in the Act's list of sexually violent offenses. 725 ILCS 207/ 5(e)(2) (West 2004). In addition, respondent argued that the State's petition failed to assert that "the agency with jurisdiction" had determined the murder to be sexually motivated. 725 ILCS 207/5(e)(2) (West 2004). He argued that the DOC was the agency with jurisdiction under the statute because, at the time that the petition was filed, respondent was in DOC custody. 725 ILCS 207/10(a) (West 2004).

The trial court denied the motion. First, relying in part on *In re Detention of Lieberman*, 201 Ill. 2d 300 (2002), the court determined that the offense of murder (as it existed when respondent's crime was committed) bore identical elements to the current offense of first degree murder and that granting respondent's motion would defeat legislative intent. Second, the court agreed with the State that it was enough for the State to allege that the murder was sexually motivated, and whether the crime was in fact sexually motivated was a factual issue requiring proof at subsequent hearings. Finally, the court stated that it did not find fatal to the pleadings the State's failure to allege that the agency with jurisdiction had determined that the murder was sexually motivated.

Respondent requested a finding supporting an interlocutory appeal pursuant to Supreme Court Rule 308 (155 Ill. 2d R. 308). The trial court denied the request. In doing so, the court reiterated that the legislature's amendment to the previous murder statute changed the name of the crime to first degree murder, but the elements of the crime remained exactly the same. Thus, the court concluded that an interlocutory appeal was unwarranted because there was no question upon which there was a substantial difference of opinion.

## D. Trial

A three-day bench trial commenced on November 6, 2007. 725 ILCS 207/35 (West 2004). The State's first witness, Dr. Barry Leavitt, testified that he is a clinical forensic psychologist. In May 2005, Dr. Leavitt conducted the court-ordered, post-probable-cause psychological evaluation of respondent "for the purposes of determining his meeting criteria as a sexually violent person." In performing his evaluation, Dr. Leavitt reviewed numerous documents, administered two actuarial tests—the Static-99 and the Minnesota Sex Offender Screening Tool Revised (MnSOST-R)—and conducted a three-hour interview of respondent.

Dr. Leavitt testified that, since January 2006 and through the date of trial, he has overseen the DOC's sexually violent persons assessment and evaluation unit—the position previously held by Dr. Fogel. Dr. Leavitt testified that, based upon his review of respondent's "statements" (presumably to police after the murder), the autopsy report, and physical crime scene evidence, the murder respondent committed was sexually motivated and respondent's "primary purpose" in committing the murder was "for the sole gratification of his sexual needs and arousal."

When Dr. Leavitt discussed the murder with respondent, respondent stated that he had no recollection of any sex crime occurring on that date. Nevertheless, respondent gave a detailed statement, approximately 12 hours after the incident, in which he described the crime. Dr. Leavitt opined that respondent's apparent lack of knowledge or his denial of having committed the crime reflects deceit, manipulation, and a psychological need to avoid acknowledging the "incredible brutality" of his sex crime, as opposed to, as respondent suggested, alcoholic blackout or brain damage.

Dr. Leavitt diagnosed respondent with the following mental disorders as defined by the DSM-IV: (1) pedophilia, sexually attracted to females, nonexclusive type; (2) alcohol abuse within a controlled environment; and (3) personality disorder, not otherwise specified, with schizoid and narcissistic features.

Relevant to the pedophilia diagnosis, Dr. Leavitt recounted that respondent had a history of improper sexual behavior. Dr. Leavitt testified that records reflected that the Department of Social Services in Delaware County, Iowa, received a letter from the mayor of Greeley, Iowa, detailing a complaint he received from the mother of a 10-year-old child (respondent's cousin). The letter alleged that, in 1953, when respondent was 13 years old, he engaged in sexually abusive behavior toward his cousin, including confronting her on her way home from school, dragging her into a nearby building, and forcibly removing her panties. In addition, the records Dr. Leavitt reviewed reflected allegations that, in 1956, when respondent was 17 years old, he engaged in "illegal sexual relations" with his 12-year-old sister. Afterwards, respondent spent time in a juvenile placement home in Toledo, Iowa. According to the records, in 1958, respondent partially tore off his mother's clothes and completely tore off his 14-year-old sister's clothes. As a result, respondent was hospitalized for a brief period.

Dr. Leavitt also noted that, as to nonsexual felony offenses, the records showed that, in 1960, respondent was convicted of conspiracy related to forging and writing bad checks. He was released in 1962, less than five months prior to committing the murder. These incidents

were relevant to Dr. Leavitt's opinion that respondent is a sexually violent person, because they spoke to the early onset of respondent's difficulty controlling his "sexual and overall impulses" as they relate to risk considerations. In addition, the incidents spoke to respondent's overall violence and the fact that he has fused his anger control issues with his sexually deviant impulses. When Dr. Leavitt interviewed respondent, respondent first stated that the reports of the incidents were lies, but then stated that they possibly occurred, but that he could not recall.

As to risk of recidivism, Dr. Leavitt noted that respondent has never received any long-term, intensive psychiatric treatment. According-ing to Dr. Leavitt, the fact that respondent has been confined since 1962 and has not acted out on account of the mental disorders does not mean that he does not still suffer from them. Dr. Leavitt noted that these disorders, in particular pedophilia, do not go away on their own and may affect one's emotional and volitional control. In addi-tion, respondent has had limited contact with young children while incarcerated, any contact had was under monitoring by DOC staff, and respondent has never participated in any sex-offender-specific treat-ment. Similarly, any work respondent performed outside of the DOC was monitored, structured, and controlled by the DOC. As for his alcoholism, respondent participated in Alcoholics Anonymous; however, Dr. Leavitt described that as more akin to a support group than to formal substance-abuse or alcohol treatment.

When asked about respondent's risk of recidivism given his age, Dr. Leavitt acknowledged that respondent was 68 years old at the time of trial, but stated that there are two equally reputable theories regarding the correlation between age and recidivism: one theory states that the risk of committing sexually violent offenses decreases with age, while the other states that age alone is not a mitigating or reducing factor. Dr. Leavitt testified that the Static-99 exam placed respondent in the moderate-to-high risk category for reoffending and that the MnSOST-R placed him in a moderate risk category. Accord-ingly, based upon the foregoing and the results of the two actuarial tests, Dr. Leavitt opined that respondent is a sexually violent person who presents a high risk of reoffending. Dr. Leavitt concluded that: (1) respondent committed a sexually violent offense, one of the purposes of which was satisfaction of his sexual interests and arousal; (2) he suffers from a mental disorder that affects his emotional or volitional control so as to predispose him to commit future sexually violent of-fenses; and (3) respondent is substantially probable, *i.e.*, more likely than not, to engage in future acts of sexual violence.

Henry Nulle testified that, in 1962, he was a sergeant with the McHenry County sheriff's office and was assigned to the criminal investigation of the rape and murder of the three-year-old victim. Nulle testified that he was present for respondent's sworn statement and admission. Nulle read that statement into the record, which included respondent's admission that, after lying down next to the three-year-old, he got an erection, was unable to get his penis "in her front," and eventually "got it in the back." The victim "kept on crying," so he pushed her face into the pillow until she stopped crying. "I didn't have to hold her there very long until she stopped. I went on having intercourse with her until I satisfied myself in her. *** I didn't know why she stopped crying." Respondent stated that he learned that she was dead when her father came home.

Dr. Lahmeyer testified consistently with his testimony at the probable-cause hearing. He concluded that, based upon his administration of the Static-99 and his review of numerous documents, respondent is a sexually violent person because his murder was sexually motivated, he suffers from the mental disorders Dr. Lahmeyer previously described, and he is substantially probable to engage in future acts of sexual violence. Dr. Lahmeyer reiterated that pedophilia, alcoholism, and antisocial personality disorder are lifelong conditions and that these conditions and factitious disorder are acquired or congenital and affect respondent's emotional and volitional capacities so as to predispose him to commit acts of sexual violence. Dr. Lahmeyer noted that respondent's history of violence and pedophilia, along with alcohol (a disinhibitor), factitious disorder (including a failure to admit to his actions), and antisocial personality (which includes a lack of remorse and a belief in his lies), make respondent unable to self-monitor his behavior. Dr. Lahmeyer agreed with Dr. Leavitt that the Static-99 placed respondent in the moderate-to-high risk category for reoffending.

Before the State rested, the parties entered a stipulation to the testimony of Dr. Gerald Dean. Dr. Dean conducted the autopsy of defendant's murder victim, and the stipulation consisted of his testimony as to the nature and extent of the victim's injuries and cause of death. Afterwards, respondent moved for a directed finding. The trial court denied the motion.

Respondent called Dr. Eric Ostrov to testify. Dr. Ostrov, at respondent's request, conducted an evaluation in October 2005 to determine whether respondent is a sexually violent person. Dr. Ostrov interviewed respondent, administered numerous psychiatric tests (including the Static-99, the MnSOST-R, and the Multi-Phasic Sexual Inventory II), and reviewed numerous documents, including the reports issued by Drs. Lahmeyer and Leavitt.

After administering the Multi-Phasic Sexual Inventory II, Dr. Ostrov found that respondent scored as a child molester would. As a result of this test, Dr. Ostrov agreed that there is evidence "that respondent does have a predisposition to molesting children." However, on the Static-99, Dr. Ostrov placed respondent in a moderate-to-low risk category; on the MnSOST-R, Dr. Ostrov placed respondent in a low risk category. Dr. Ostrov scored respondent differently than Drs. Lahmeyer and Leavitt on those tests because Dr. Ostrov believed that the allegations regarding respondent's conduct with his sisters, mother, and cousin were not prior offenses for scoring purposes. He based this conclusion on the fact that those incidents were reflected in the record as allegations, rumors, and/or letters, but that no charges or convictions followed the incidents. Dr. Ostrov also concluded that respondent possessed a low risk of recidivism because, in his view, recidivism rates for persons released from custody at age 70 or older are essentially zero and respondent was, at the time of trial, 68 years old.

Dr. Ostrov agreed that respondent was an alcoholic before he was incarcerated, but noted that the records reflected that respondent tried to address that issue by attending Alcoholics Anonymous. Dr. Ostrov thus diagnosed respondent with alcohol abuse in "sustainful remission," meaning that, although respondent is an alcoholic, the risk of his relapsing is minimal because his abuse has been in remission for about 35 to 40 years. Dr. Ostrov also diagnosed respondent with borderline intellectual functioning and antisocial personality resolving—meaning that, once incarcerated, he began acting differently and, for the last 40 years, has not caused problems. Dr. Ostrov found respondent's DOC work records relevant because they demonstrated that respondent functions well when he is not closely monitored.

Dr. Ostrov did not diagnose pedophilia. He noted that respondent got married while incarcerated and that the marriage lasted 13 years. Dr. Ostrov did not find significant that respondent allegedly did not inform his wife of the reason for his incarceration, as, according to Dr. Ostrov, many people do not disclose their complete life histories to their significant others. Dr. Ostrov also noted that, while incarcerated, respondent was not found to possess any pornographic materials, nor did he exhibit any inappropriate sexual behavior.

Dr. Ostrov concluded, based on respondent's age, his low score on actuarial instruments, and the lack of evidence that respondent has acted out in the past 40 years, that respondent possessed a low risk of reoffending. Nevertheless, Dr. Ostrov did not believe that he was qualified to opine as to whether respondent's risk of reoffending qualifies

as "substantially probable" under the statute. Addressing respondent's possible release, Dr. Ostrov opined that, although respondent's risk of reoffending is low, safeguards to protect the community should be taken, including: intense supervision to ensure that he has no exposure to children; mandatory sex-offender and alcohol treatment; residence in a halfway house with close monitoring and supervision; electronic monitoring; and, if deemed appropriate by doctors, anti-testosterone medication to lower respondent's sex drive. Regarding the murder respondent committed, Dr. Ostrov testified, "I have no doubt it was a sexual offense."

Respondent's final witness, Dr. Fogel, testified to the screening process and his evaluation of respondent, as previously described. In addition, Dr. Fogel opined that respondent does not meet the definition of a sexually violent person, because he does not have a mental disorder and, if he does, it is not substantially probable that he will sexually reoffend. Dr. Fogel stated:

"So it would take in my opinion a tremendous amount of inference today that he has such a condition that predisposes him to engage in acts of sexual violence given his history as well as given his 40 some years of incarceration during which there is no documented incidents of any type of sexual acting out behavior, there is no documented incidence of antisocial behavior or inappropriate behavior involving women or perhaps children in the waiting room, or in the visiting room."

Dr. Fogel explained that, while incarcerated, respondent was permitted to work outside of the prison environment and that there were no complaints that respondent misbehaved or acted out sexually. Dr. Fogel did not agree that respondent suffers from pedophilia. Regarding the allegations that respondent tore off his mother's and sister's clothes and pulled off his cousin's panties, Dr. Fogel acknowledged that those actions have a sexual component. However, Dr. Fogel testified that what actually transpired during those incidents, and whether respondent's primary motivation in those incidents was sex or violence, is unclear from the record. Dr. Fogel noted that, after those incidents, respondent was hospitalized and diagnosed with psychotic episodes; thus, without details concerning those incidents, he found unclear whether respondent was delusional or possibly hearing voices during those events. Dr. Fogel acknowledged that a person might have pedophilia and not act out in 45 years, but stated that to do so, "[respondent] would be doing a pretty good job."

Dr. Fogel further testified that respondent's history reflects that he had an alcohol abuse disorder, but that respondent presumably had access to alcohol when he worked outside of the DOC and possibly

while within the DOC and that there is no evidence that he consumed alcohol while in custody. In addition, he noted that respondent participated in Alcoholics Anonymous. Dr. Fogel nevertheless testified that, if respondent returned to alcohol use, his risk of reoffending would be "significantly increased." Dr. Fogel also agreed that one way to avoid sexual reoffending is to acknowledge that one's prior sexual behavior was deviant, something that respondent has not done. Dr. Fogel agreed that the act of murdering and raping a three-year-old child was "absolutely" deviant.

The trial court found respondent to be a sexually violent person. Specifically, the court found that the State proved beyond a reasonable doubt that respondent: (1) committed a sexually violent offense as defined in section 5(e) of the Act—a sexually motivated murder; (2) has mental disorders as defined in the Act, namely pedophilia, alcohol abuse, and antisocial personality disorder; and (3) is a danger because his mental disorders make it substantially probable that he will engage in future acts of sexually violent behavior. The court ordered respondent committed to the custody of the Department of Human Services. Respondent appeals.

## II. ANALYSIS

### A. Motion to Dismiss

Respondent raises two issues regarding his motion to dismiss the State's petition. First, he argues that the trial court erred in denying his motion to dismiss because murder is not a sexually violent offense as defined by the statute. Second, he contends that the agency with jurisdiction had not determined that the murder upon which his conviction was based was sexually motivated, and he notes that the State failed to present any evidence at the probable-cause hearing from the agency with jurisdiction. Therefore, on what appear to be issues of first impression, we are asked to determine whether a conviction of murder (as opposed to first degree murder) constitutes a "sexually violent offense" within the meaning of the Act. In addition, we consider whether a petition for sexually violent person adjudication that is based upon a murder conviction must allege that the "agency with jurisdiction" has determined that the murder was sexually motivated. Before addressing respondent's arguments, we review the relevant statutory provisions.

The Act provides that, no later than six months prior to the anticipated release from custody of a person convicted of a "sexually violent offense," the DOC shall send written notice to the State's Attorney's office of the person's anticipated release date and "that the person will be considered for commitment under this Act prior to that

release date." 725 ILCS 207/9 (West 2004). In addition, the "agency with jurisdiction," defined as "the agency with the authority or duty to release or discharge the person," shall, if it has control or custody "over a person who *may* meet the criteria for commitment as a sexually violent person," provide certain information to the Attorney General and State's Attorney three months prior to the person's discharge date, including the person's name and offense history, a comprehensive evaluation of the person's mental condition, "the basis upon which a determination has been made that the person is subject to commitment under [the Act,] and a recommendation for action in furtherance of the purposes of this Act." (Emphasis added.) 725 ILCS 207/10(a), (b), (c)(2) (West 2004).

The Act then permits the Attorney General, "at the request of the agency with jurisdiction over the person *** *or on his or her own motion,*" or the State's Attorney, or both, to petition the court for the person's civil detention beyond his or her period of incarceration if the State establishes that the offender meets the definition of a "sexually violent person." (Emphasis added.) 725 ILCS 207/15(a)(1) (West 2004); *Lieberman,* 201 Ill. 2d at 309. A "sexually violent person" is defined as "a person who has been convicted of a *sexually violent offense* *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." (Emphasis added.) 725 ILCS 207/5(f) (West 2004). Section 5(e) of the Act defines a "sexually violent offense" as:

"(1) Any crime specified in Section 11—6, 12—13, 12—14, 12—14.1, or 12—16 of the Criminal Code of 1961 [(720 ILCS 5/11—6, 12—13, 12—14, 12—14.1, 12—16)]; or

(1.5) Any former law of this State specified in Section 11—1 (rape), 11—3 (deviate sexual assault), 11—4 (indecent liberties with a child) or 11—4 (aggravated indecent liberties with a child) of the Criminal Code of 1961 [(720 ILCS 5/11—1, 11—3, 11—4)]; or

(2) *First degree murder, if it is determined by the agency with jurisdiction to have been sexually motivated;*[2] or

(3) Any solicitation, conspiracy or attempt to commit a crime under paragraph (e)(1) or (e)(2) of this Section." (Emphasis added.) 725 ILCS 207/5(e) (West 2004).

The sexually violent person petition must allege that the person: (1) has been convicted of a sexually violent offense; (2) has a mental

---

[2]"Sexually motivated" means that "one of the purposes for an act is for the actor's sexual arousal or gratification." 725 ILCS 207/5(d) (West 2004).

disorder[3]; and (3) is dangerous to others because the mental disorder creates a substantial probability that he or she will in engage in acts of sexual violence. 725 ILCS 207/15(b) (West 2004). The petition must further state, "with particularity," essential facts to establish probable cause to believe that the person is a sexually violent person, and, when the petition is based upon a conviction of sexually motivated murder, "the petition shall state the grounds on which the offense or act is alleged to be sexually motivated." 725 ILCS 207/15(c) (West 2004). After the petition is filed, the court must hold a hearing to determine whether there is probable cause to believe that the individual is a sexually violent person. 725 ILCS 207/30(b) (West 2004). If the court, after the hearing, determines that probable cause exists, it must order that the individual be taken into custody and transferred to an appropriate facility for an evaluation as to whether the individual is a sexually violent person. 725 ILCS 207/30(c) (West 2004). At trial on the petition, the State must prove the petition's allegations beyond a reasonable doubt, and if the petition is based upon a murder conviction, the State must prove beyond a reasonable doubt that the murder was sexually motivated. 725 ILCS 207/35(d) (West 2004).

It is within this statutory framework that we consider respondent's arguments. As this appeal derives from the denial of a section 2—615 motion to dismiss, our review is *de novo*. *Hadley v. Illinois Department of Corrections*, 224 Ill. 2d 365, 370 (2007). In addition, whether the motion to dismiss was properly denied turns on issues of statutory construction, which we also review *de novo*. *Hadley*, 224 Ill. 2d at 370.

The primary objective in construing a statute is to ascertain and effectuate the intention of the legislature. *Lieberman*, 201 Ill. 2d at 307. "All other rules of statutory construction are subordinate to this cardinal principle." *Lieberman*, 201 Ill. 2d at 307. The most reliable indicator of legislative intent is the language of the statute. *Lieberman*, 201 Ill. 2d at 308. Statutory language is to be given its plain, ordinary, and "popularly understood meaning," and we "afford the statutory language the fullest, rather than the narrowest, possible meaning to which it is susceptible." *Lieberman*, 201 Ill. 2d at 308. All provisions of a statute are to be viewed as a whole; words and phrases are not construed in isolation but, rather, are interpreted in light of other, relevant statutory provisions. *Lieberman*, 201 Ill. 2d at 308. If possible, the words, clauses, and sentences in a statute should be given reasonable meaning so as not to be rendered superfluous. *Lieber-*

---

[3]"Mental disorder" is defined as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2004).

*man,* 201 Ill. 2d at 308. To determine the legislature's intent, we may also consider the reason, necessity, and purpose of the law, as well as the consequences that would result from construing it one way or another. *Lieberman,* 201 Ill. 2d at 308. Courts are not bound by the literal language of a statutory clause that would defeat the legislature's obvious intent. *Lieberman,* 201 Ill. 2d at 312. Finally, in construing the statute, we presume that the General Assembly did not enact the legislation intending "absurdity, inconvenience or injustice." *Lieberman,* 201 Ill. 2d at 308-09.

## 1. *Murder*

Respondent argues that he was not convicted of a sexually violent offense under the Act, because he was convicted of murder, not first degree murder. The State counters that the elements of murder and first degree murder are identical and, therefore, a sexually motivated murder that occurred in 1962 may serve as a predicate under the Act for a sexually violent person adjudication. We agree.

Respondent correctly asserts that, to fall within the Act's purview, his underlying conviction must be of one of the Act's defined sexually violent offenses. In other words, the State may not validly petition for respondent's civil commitment as a sexually violent person if his conviction does not constitute a sexually violent offense as defined by the Act. See *In re Detention of Diestelhorst,* 307 Ill. App. 3d 123, 126 (1999). As respondent notes, the Act lists a conviction of sexually motivated "first degree murder," not murder, as a sexually violent offense. In considering whether murder qualifies as a sexually violent offense under the Act, we find *Lieberman* instructive.

In *Lieberman,* the supreme court considered whether the legislature intended to include as a sexually violent offense the repealed offense of rape. *Lieberman,* 201 Ill. 2d at 312-13. The court noted that, in 1984, the offense of rape was repealed and subsumed within the definitions of several other offenses set forth in Public Act 83—1067 (Pub. Act 83—1067, eff. July 1, 1984). *Lieberman,* 201 Ill. 2d at 313-14. In 1998, when the legislature enacted the Sexually Violent Persons Commitment Act and enumerated sexually violent offenses with reference to statutory citations, the crime of rape, which had been removed from the criminal code, was not specifically included as a qualifying sexually violent offense. *Lieberman,* 201 Ill. 2d at 315; see 725 ILCS 207/5(e) (West 1998). The supreme court held that rape was subsumed within the Act's enumerated sex offenses and, therefore, that the legislature intended for rape to constitute a sexually violent offense. *Lieberman,* 201 Ill. 2d at 317-18, 320. In part, the court found support for its conclusion by comparing the elements of the former offense of

rape with the elements of criminal and aggravated criminal sexual assault, finding that the comparison revealed that the latter crimes broadened the scope of sexual conduct deemed criminal. *Lieberman,* 201 Ill. 2d at 315-16. In addition, the court found that comparing the statutes revealed that the conduct underlying the respondent's rape convictions would have also subjected him to charges under the sexual-assault statutes. *Lieberman,* 201 Ill. 2d at 316-17. The court noted that interpreting the statute to exclude rape would lead to unintended, absurd consequences in light of the statute's purpose to keep citizens safe from dangerous sex offenders. *Lieberman,* 201 Ill. 2d at 319-20.

Applying *Lieberman*'s principles here, we find that a sexually motivated murder under the former version of the murder statute may constitute a sexually motivated first degree murder and, thus, a sexually violent offense under the Act. In so finding, we consider legislative intent, the purpose of the Act, and the consequences that would result from construing the Act as respondent suggests. *Lieberman,* 201 Ill. 2d at 308. We are "obliged to construe statutes to avoid absurd or unjust consequences." *People v. Shumpert,* 126 Ill. 2d 344, 352 (1989).

The Criminal Code of 1961 included the offenses of murder (Ill. Rev. Stat. 1961, ch. 38, par. 9—1) and voluntary manslaughter (Ill. Rev. Stat. 1961, ch. 38, par. 9—2). A legislative amendment effective January 1, 1987, changed the name of murder to first degree murder and the name of voluntary manslaughter to second degree murder. Pub. Act 84—1450, eff. January 1, 1987. However, the elements of the former version of murder were not altered by the amendment. Specifically, the 1961 version of murder read:

"(a) A person who kills an individual without lawful justification commits *murder* if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) He is attempting or committing a forcible felony other than *voluntary manslaughter.*" (Emphases added.) Ill. Rev. Stat. 1961, ch. 38, par. 9—1.

The 1987 amendment altered the statute to read:

"(a) A person who kills an individual without lawful justification commits *first degree* murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) He is attempting or committing a forcible felony other than *second degree murder*." (Emphases added.) Pub. Act 84—1450, eff. January 1, 1987.

See also 720 ILCS 5/9—1(a) (West 2004).

Accordingly, the crime of first degree murder contains exactly the same elements as the former offense of murder—only the name has changed. As the legislature specifically included sexually motivated first degree murder in its definition of sexually violent offenses under the Act, and first degree murder contains exactly the same elements as the former offense of murder, it follows that a conviction of sexually motivated murder may constitute a sexually violent offense under the Act. We note that the conduct underlying respondent's murder conviction would have also subjected him to charges under the current first-degree-murder statute. See, *e.g.*, *Lieberman*, 201 Ill. 2d at 316-17. As in *Lieberman*, to exclude sexually motivated murder from the Act's reach would lead to unintended, absurd, and unjust consequences in light of the statute's purpose to keep citizens safe from dangerous sex offenders. See *Lieberman*, 201 Ill. 2d at 319-20.

Respondent argues that *Lieberman* is inapposite here because, in contrast to the rape statute, the offense of first degree murder did not broaden the prior offense of murder but, instead, altered the rules of evidence required for a conviction. Respondent, relying on *Shumpert*, notes that the supreme court has declared that retroactive application of the first-degree-murder statute would violate the prohibition against *ex post facto* laws because of the differences in proof between murder and first degree murder. *Shumpert*, 126 Ill. 2d at 351-52. Thus, respondent concludes that the different evidentiary requirements between murder and first degree murder preclude a conclusion that murder was subsumed into first degree murder.

First, respondent confuses first degree murder with second degree murder. As noted above, the 1987 amendment changed only the name given to the former version of murder. In contrast, the offense of voluntary manslaughter was not only renamed second degree murder, but the amendment also changed the burden of proof for establishing second degree murder. Formerly, the State bore the burden of proving the elements of murder beyond a reasonable doubt and, if the defendant presented evidence of a factor in mitigation that might reduce the offense of murder to voluntary manslaughter, the State again bore the burden to prove beyond a reasonable doubt the absence of that mitigating factor. See *Shumpert*, 126 Ill. 2d at 351. The 1987 amendment changed those burdens such that a defendant now bears

the burden to establish, by a preponderance of the evidence, a factor in mitigation that might reduce a first degree murder offense to a second degree murder offense (instead of requiring the State to prove the absence of such a factor beyond a reasonable doubt). *Shumpert*, 126 Ill. 2d at 351-52. Thus, the evidentiary requirements pertaining to second degree murder, which were relevant to the supreme court's consideration of *ex post facto* principles, are not relevant to our consideration of whether murder is covered by the Act.

Second, in our view, respondent's argument that first degree murder did not broaden the prior offense of murder and, thus, murder cannot be said to have been subsumed by the amendment, actually undermines his position. First degree murder did not broaden the offense of murder, because they are one and the same. In other words, we need not consider whether a broader crime subsumed another crime, because the two crimes are *identical*. In essence, murder *became* first degree murder. As stated in *Lieberman*, "[r]espondent's proposed construction of the statute would be an unwarranted triumph of form over substance, defeating the very purpose for which the statute was enacted." *Lieberman*, 201 Ill. 2d at 319.

Respondent notes that, in 2000, in response to *Lieberman*, the legislature amended the Act to specifically add to its list of sexually violent offenses the charges formerly known as rape, deviate sexual assault, indecent liberties with a child, and aggravated indecent liberties with a child. Pub. Act 91—875, eff. June 30, 2000; 725 ILCS 207/5(e)(1.5) (West 2000). The legislature did not, however, add prior versions of the murder statute. Thus, respondent concludes that the legislature did not intend for the Act to include the prior offense of murder. We disagree. The legislature amended the Act to make clear that several repealed sex offenses, including rape, were originally intended to be included within the Act's definition of sexually violent offenses. *Lieberman*, 201 Ill. 2d at 323. As murder and first degree murder contain identical elements, there was, in effect, nothing absent from the Act.

Finally, respondent's reliance on *Diestelhorst* is misplaced. There, the court found that child abduction could not serve as a predicate offense for a sexually violent person petition, not only because the crime is absent from the Act's list of sexually violent offenses, but because, contrary to the State's assertion, the respondent had not been convicted of an *attempt* to commit other listed sexually violent offenses pursuant to section 5(e)(3) of the Act. *Diestelhorst*, 307 Ill. App. 3d at 129-30. The scope of the attempt language that appears in section 5(e)(3) of the Act is not at issue here.

## 2. *Determination by the Agency with Jurisdiction*

We next address respondent's argument that the trial court improperly denied his section 2—615 motion because there was no determination by the agency with jurisdiction that the murder he committed was sexually motivated. As described above, section 5(e)(2) of the Act delineates several crimes that constitute sexually violent offenses, including first degree murder "if it is determined by the agency with jurisdiction to have been sexually motivated." 725 ILCS 207/ 5(e)(2) (West 2004). It is undisputed here that the DOC was the agency with jurisdiction because, at the time the petition was filed, respondent remained incarcerated and the DOC was the agency with the authority or duty to release him. 725 ILCS 207/10(a) (West 2004).

Respondent argues that, when the petition was filed and the probable-cause hearing was held, no one from the DOC (specifically, Dr. Fogel) had determined that the murder was sexually motivated and, in fact, Dr. Fogel declined to refer him for sexually violent person proceedings. He asserts that the statute is clear that the agency with jurisdiction may refer a person to the Attorney General for the filing of a petition *or* that the Attorney General or State's Attorney may file the petition on his or her own. Nevertheless, he contends that the statute is also clear that only the agency with jurisdiction can make the determination of whether the murder was sexually motivated. Respondent further notes that the State's petition alleged in two places that the murder was sexually motivated, but that neither reference stated that the agency with jurisdiction had determined the murder to be sexually motivated.

Further, respondent notes that the only witness at the probable-cause hearing, Dr. Lahmeyer, had no association with the DOC. Although respondent concedes that, after Dr. Fogel left the DOC, Dr. Leavitt assumed his position as director of the unit, evaluated respondent, and testified at trial that the murder was sexually motivated, he argues that the subsequent finding is irrelevant to the sufficiency of the petition and that trial evidence from the agency with jurisdiction does not cure pleading defects. Accordingly, respondent asserts that, because whether the murder was sexually motivated is a threshold issue to be determined by the agency with jurisdiction, that determination is an element that must be shown in the pleadings and, without it, the petition must be dismissed. We disagree with petitioner's arguments and conclude: (1) the absence of an allegation in the petition that the agency with jurisdiction found the murder to be sexually motivated is not fatal to the pleadings; and (2) the DOC here made the determination that the murder respondent committed was sexually motivated.

Respondent's argument that the petition failed to state a cause of action because it did not allege an element—that the DOC had determined the murder to be sexually motivated—and because there was no testimony at the probable-cause hearing from a DOC representative reads into the statute requirements that do not exist. We read all statutory provisions as a whole; words and phrases are not construed in isolation but, instead, are interpreted in light of other statutory provisions. *Lieberman*, 201 Ill. 2d at 308. The statute requires only that the petition state, "with particularity," essential facts to establish probable cause to believe that the person is a sexually violent person, namely: (1) that the person has been convicted of a sexually violent offense; (2) that the person has a mental disorder; (3) that the person is dangerous to others because the mental disorder creates a substantial probability that he or she will in engage in acts of sexual violence; and (4) when the petition is based upon a conviction of sexually motivated murder, the grounds on which the offense or act is alleged to be sexually motivated. 725 ILCS 207/15(b), (c) (West 2004). This statutory provision, which outlines the required contents of a sexually violent person petition, does not mention or require the State to allege the agency with jurisdiction's "sexually motivated" finding.

Nor does the provision governing the probable-cause hearing mention the agency with jurisdiction's "sexually motivated" finding or otherwise require at the probable-cause hearing representation from the agency with jurisdiction. 725 ILCS 207/30 (West 2004). It is axiomatic that a cause of action should not be dismissed on a section 2—615 motion unless no set of facts can be proved that would entitle the petitioner to relief. *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009). Here, the Act requires that proof *at trial*. 725 ILCS 207/35(d)(2) (West 2004). Thus, the statutory scheme clearly delineates what must be in the petition and anticipates that those allegations will be proved at subsequent proceedings. The absence of an allegation that the agency with jurisdiction determined that the murder was sexually motivated and the absence of a DOC representative at the probable-cause hearing are not fatal to the pleadings.

Respondent's interpretation of the statutory "determination" implies that, before a petition may be filed, the DOC must issue a formal finding that the crime was sexually motivated and, without that formal finding, the State is precluded from pursuing a petition under the Act. Respondent's interpretation would potentially give the DOC gatekeeping authority to determine when the State may petition for civil commitment under the Act. Again, considering the statute as a whole, legislative intent, the purpose of the law, and the consequences

that would result from such a construction, we cannot subscribe to this interpretation. First, the fact that the statute permits the State to proceed on its own, even absent a referral by the agency with jurisdiction, leads us to believe that the legislature did not intend for the DOC to have the authority to preclude the State from acting. 725 ILCS 207/15(a) (West 2004). Second, the statute requires that the court, after determining that probable cause exists, order an evaluation as to whether the individual is a sexually violent person, an evaluation that would necessarily require consideration of whether the person committed a sexually violent offense and, when the offense is murder, whether it was sexually motivated. 725 ILCS 207/30(c) (West 2004). This provision suggests that the legislature intended that formal determinations or evaluations regarding sexually violent person status would occur after the initial pleading stage such that the absence of such a finding in the petition would not be fatal to the cause of action.

We acknowledge that the agency determination appears in the *definition* of a sexually violent offense predicated on first degree murder. Thus, although we determine that it is not required to be pleaded, presumably the State must establish the existence of the agency determination at some point in the proceedings, or the language would be rendered superfluous. *Lieberman*, 201 Ill. 2d at 308 (statutory clauses should not be rendered superfluous). As evidenced here, and pursuant to the foregoing analysis, we believe that the required determination may be more akin to an identification than to a formal finding. In our view, in light of the fact that the statute requires the DOC to satisfy certain notice requirements (725 ILCS 207/9, 10 (West 2004)), it would be reasonable to conclude that the legislature merely intended that the DOC *not* send notice to the State of all inmates convicted of first degree murder who would soon be released but, rather, that it send notice regarding only those first degree murders that it determines were sexually motivated. The Attorney General may then determine whether to proceed under the Act, and sexual motivation must be proven at trial.

In any event, the record here reflects that, in 2002, well before the petition was filed, the DOC implicitly determined that respondent committed a sexually motivated murder. Under the statute, as inmates near discharge from custody, the DOC must determine who might constitute a sexually violent person and send written notice, first, to the State's Attorney of those convicted of sexually violent offenses (725 ILCS 207/9 (West 2004)), and, then, to the Attorney General and State's Attorney of those who "may meet the criteria" of a sexually violent person (725 ILCS 207/10(b) (West 2004)). Dr. Fogel testified

that, to meet these statutory obligations, the DOC sex offender evaluation unit reviews a list of all inmates soon to be released who were convicted of crimes that are inherently sexual under the Act (725 ILCS 207/5(e)(1), (e)(1.5) (West 2004)). In addition, Dr. Fogel testified that the list generated within the unit includes those inmates about to be released who have murder convictions; the unit then determines which of those murders was sexually motivated. Dr. Fogel described that, after reviewing the list, the unit decides who to "follow up on," screens those files (which include medical records, offense reports, and other records), and then interviews the individuals as it deems necessary. Accordingly, when respondent's name appeared on the list as an inmate convicted of murder and the unit decided to follow up by screening his file, it implicitly determined that the murder of which respondent was convicted was sexually motivated. The State asserts, and we agree, that it is reasonable to presume that the unit would not review the contents of files for murder convictions that were clearly *not* sexually motivated—for example, a drive-by shooting.

In addition, Dr. Fogel testified at trial regarding his evaluation of respondent (which took place before the petition was filed) and explained that his conclusion that respondent was not a candidate for sexually violent person status was based upon his opinions that respondent: (1) did not have a mental disorder; and (2) did not present a substantial probability to sexually reoffend. Dr. Fogel did *not* dispute that the murder was sexually motivated, nor did he list as one of his reasons for his nonreferral (prepetition/preprobable-cause hearing) a finding that the murder was not sexually motivated. Indeed, Dr. Fogel testified that the sex acts and murder respondent committed were "absolutely" deviant. Respondent's argument that Dr. Fogel's nonreferral means that there was no determination that his murder was sexually motivated is unavailing. As Dr. Fogel's testimony suggests, a nonreferral may be based instead on the DOC's determination that the individual does not have a mental disorder or does not present a substantial probability to reoffend.

Certainly, the DOC made an explicit determination that the murder was sexually motivated after the probable-cause hearing. Dr. Leavitt, who assumed Dr. Fogel's role as the DOC's director of the sex offender evaluation unit, was ordered by the court after the probable-cause hearing to evaluate respondent for the sole purpose of determining whether respondent is a sexually violent person. Dr. Leavitt concluded that respondent met the criteria for a sexually violent person, specifically testifying at trial that the murder respondent committed was sexually motivated because respondent's "primary purpose" in committing the murder was "for the sole gratification of his sexual needs and arousal."

Thus, here, the DOC made the determination that the murder respondent committed was sexually motivated, in our view both before the petition was filed and during the trial proceedings. Further, we agree with the trial court that the statute does not require reference to the agency with jurisdiction's determination in order for a petition to state a cause of action. We conclude that the trial court properly denied respondent's section 2—615 motion to dismiss.

## B. Sufficiency of Evidence

Respondent challenges the sufficiency of the evidence to find him a sexually violent person. In reviewing respondent's argument, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could find that the required elements have been proved beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985); *In re Detention of Tittlebach*, 324 Ill. App. 3d 6, 11 (2001). Here, the State was required to prove beyond a reasonable doubt that: (1) respondent was convicted of a sexually violent offense and, because the alleged offense was murder, that it was sexually motivated; (2) respondent has a mental disorder; and (3) the mental disorder makes it substantially probable that he will engage in acts of sexual violence. 725 ILCS 207/5(f), 15, 35(d) (West 2004).

Respondent does not allege that the State failed to meet its burden at trial to show that he was convicted of a sexually violent offense and that the murder he committed was sexually motivated. Instead, respondent focuses on the second and third elements, arguing that there was conflicting and, therefore, insufficient evidence regarding the existence of mental disorders that make it substantially probable that he will reoffend. Respondent asserts that the experts' opinions were largely in conflict regarding: whether it was appropriate in forming their conclusions to rely upon allegations regarding respondent's conduct with his sisters, mother, and cousin before the murder; the scoring of various actuarial tests; his overall risk of reoffending; and, in particular, whether his age impacted the likelihood that he would reoffend.

Respondent further argues that, with respect to diagnosing a mental condition, several contradictory opinions were rendered and that multiple differing diagnoses create reasonable doubt. In addition, he argues that many of the opinions lack credibility in light of the absence of evidence that he engaged in any inappropriate sexual conduct or drank any alcohol while incarcerated. Finally, respondent notes that no one diagnosed him with pedophilia in the 10 years he was under psychiatric care prior to his murder trial, in the 31 years he was in prison, or in two evaluations by DOC experts. Instead, three

days before he was due to be released, the State, after disagreeing with the two DOC experts, retained an independent expert, who diagnosed him as a pedophile at the age of 68.

Respondent's claims simply attack the weight of the evidence and witness credibility. It is not our function, in reviewing a challenge to the sufficiency of the evidence, to retry the defendant. *Tittlebach*, 324 Ill. App. 3d at 11; see also *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 602-03 (2007). Instead, it is the province of the trier of fact to evaluate witness credibility, resolve conflicts in the evidence, and draw reasonable inferences therefrom. *Tittlebach*, 324 Ill. App. 3d at 11.

In *Tittlebach*, we rejected a challenge to the sufficiency of the evidence that led to a sexually violent person finding when the respondent proffered similar arguments to those presented here. *Tittlebach*, 324 Ill. App. 3d at 10-11. There, the respondent argued that the State's expert improperly scored a test by including an erroneously characterized event as a sexual offense, and, thus, that the expert's opinion that he was substantially probable to reoffend was not credible. *Tittlebach*, 324 Ill. App. 3d at 10. We noted that, regardless of whether the scoring was improper, it was the trial court's duty to weigh the evidence. *Tittlebach*, 324 Ill. App. 3d at 11. Moreover, the challenged test was only one of several bases for the expert's opinion, which also included other assessment tests and the respondent's records and criminal history. "Although [the] respondent's expert *** did not agree with the ultimate conclusion drawn by the State's experts, we will not disturb the findings of the trier of fact because he was in the best position to weigh the testimony of the experts and assess their credibility." *Tittlebach*, 324 Ill. App. 3d at 11. We concluded that the evidence was sufficient to affirm the trial court's finding, noting that "two experts testified that [the] respondent has a mental disorder that makes it substantially probable that he will commit sexually violent acts in the future. Both relied on psychological testing, the case record, police reports, mental health evaluations, presentence reports, and interviews with [the] respondent." *Tittlebach*, 324 Ill. App. 3d at 11-12.

Similarly, in *Lieberman*, the respondent challenged the sufficiency of the evidence to support the findings that he had a mental disorder and that the disorder made it substantially probable that he would engage in future acts of sexual violence. The respondent argued, in part, that the State's witnesses improperly relied upon past crimes and anecdotal information in rendering their diagnoses, that he had not engaged in any nonconsensual sexual activity in 26 years, and that the witnesses improperly relied upon certain actuarial assessments. *Lieberman*, 379 Ill. App. 3d at 602. On appeal, the court rejected these

arguments as merely attacking the credibility of the witnesses and the weight to be given their testimony, which fall into the province of the trier of fact. *Lieberman*, 379 Ill. App. 3d at 602. The court noted that the respondent had explored the alleged inadequacies in the witnesses' opinions via the traditional methods of cross-examination, presentation of his own witnesses, and argument. *Lieberman*, 379 Ill. App. 3d at 602-03. The court concluded that it saw no valid reason to substitute its judgment for that of the trier of fact. *Lieberman*, 379 Ill. App. 3d at 603.

Here, we similarly reject respondent's challenges to the credibility of the State's witnesses and the weight to be given to their testimony. The trial court was presented with respondent's challenges to the State's witnesses through his cross-examination, his witnesses, and his argument. Nevertheless, the trial court, by finding respondent to be a sexually violent person, implicitly credited the State's witnesses. As seen below, none of the experts' testimony was inherently incredible and we see no reason to disturb the trial court's judgment.

A rational trier of fact could have found beyond a reasonable doubt all required elements for sexually violent person adjudication. First, three expert witnesses, Drs. Lahmeyer, Leavitt, and Ostrov, testified that the murder respondent committed was sexually motivated. Further, Dr. Fogel testified that it was "sexually deviant." Thus, viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded beyond a reasonable doubt that respondent committed a sexually violent offense under the statute.

Second, the trial court found that respondent suffers from three mental disorders under the Act: pedophilia, alcohol abuse, and antisocial personality disorder. Two expert witnesses, Drs. Lahmeyer and Leavitt, diagnosed respondent with pedophilia. Three expert witnesses, Drs. Lahmeyer, Leavitt, and Ostrov, diagnosed personality disorders. All expert witnesses, Drs. Lahmeyer, Leavitt, Ostrov, and Fogel, diagnosed alcohol abuse.

It is true that, with respect to some of the disorders, there was disagreement among the experts regarding severity and/or current presence. For example, Dr. Ostrov characterized the antisocial personality disorder as resolving and the alcohol abuse as in remission. However, even where respondent's experts, Drs. Ostrov and Fogel, disagreed with the diagnoses, they acknowledged the presence of characteristics relevant to those diagnoses. For example, Dr. Ostrov did not diagnose respondent as suffering from pedophilia, but he acknowledged that there was evidence to support that respondent has a predisposition to molesting children. Similarly, Dr. Fogel did not diagnose respondent with any mental conditions, but he conceded that

one could have pedophilia despite not acting out while incarcerated and that respondent's history reflects alcohol dependence. Thus, although the experts differed in some respects, both as to diagnoses and as to whether certain diagnoses were in remission, it was the trial court's function to weigh the evidence and resolve conflicts therein.

We note, too, that, although the experts might have disagreed regarding the number of disorders respondent possesses, the Act requires the existence of only one disorder "affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b), (f) (West 2004). The disorders that the trial court found here have formed the bases of sexually violent person adjudications in other cases. See *Lieberman*, 379 Ill. App. 3d at 601-02 (diagnoses of antisocial and narcissistic personality, paraphilia, and cannabis abuse disorders); *In re Detention of Stevens*, 345 Ill. App. 3d 1050, 1063 (2004) (diagnoses of paraphilia, antisocial personality disorder, and substance abuse disorder); *Tittlebach*, 324 Ill. App. 3d at 8, 11-12 (diagnoses of pedophilia, alcohol abuse, and personality disorder with antisocial and narcissistic features). Thus, viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded beyond a reasonable doubt that respondent possesses a mental disorder.

Third, two expert witnesses, Drs. Lahmeyer and Leavitt, testified that respondent's mental disorder(s) make it substantially probable that he will engage in future acts of sexual violence. Respondent's expert, Dr. Ostrov, rendered no opinion on this issue, but noted that, if respondent were released into the community, several safeguards should be implemented to prevent incidents of recurrence. Dr. Fogel, however, testified that there was no mental disorder and, if there was, it would not lead respondent to reoffend. As respondent points out, his experts' opinions on this point differed from the State's experts' opinions largely as a result of scoring methods on various actuarial assessments. Respondent notes that the differences were primarily dependent on whether the evaluator considered as prior offenses the allegations concerning his mother, sisters, and cousin. However, the reasons for the scoring differences were presented to the trial court when it considered and weighed the evidence; it was the trial court's function to resolve any conflicts in the evidence.

As in *Tittlebach*, the experts here did not rely solely upon the actuarial assessments in rendering their opinions. All experts testified that they rendered their opinions after also reviewing extensive documents, including numerous past evaluations of respondent and custodial and criminal reports. In addition: (1) Dr. Leavitt noted that respondent denies that the murder occurred; (2) Dr. Fogel testified

that respondent has not acknowledged his prior sexually deviant behavior, a factor relevant to recidivism; and (3) Dr. Lahmeyer testified that respondent's failure to acknowledge his actions, his belief in his own lies, and the potential disinhibitive effect of alcohol (should respondent drink again) render respondent unable to self-monitor his behavior. Thus, even without the results of the performed evaluations, the trial court was presented with sufficient evidence for its conclusion that it is substantially probable that respondent will reoffend. Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded beyond a reasonable doubt that respondent's mental disorder(s) make it substantially probable that he will engage in acts of sexual violence.

In sum, we find that the evidence was sufficient for the trial court to have found beyond a reasonable doubt that respondent is a sexually violent person as defined by the Act.

### III. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of McHenry County is affirmed.

Affirmed.

BURKE and HUDSON, JJ., concur.