No. 2-09-1052    Filed: 11-8-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re DETENTION OF | ) | Appeal from the Circuit Court |
| FRED LENCZYCKI | ) | of Du Page County. |
| | ) | |
| | ) | No. 06--MR–486 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellant, v. Fred Lenczycki, | ) | Bonnie M. Wheaton, |
| Respondent-Appellee). | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the opinion of the court:

On March 19, 2008, the respondent, Fred Lenczycki, who had previously been convicted of the aggravated criminal sexual abuse of three minors and had served a term of incarceration for those convictions, was adjudicated a sexually violent person under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 et seq. (West 2006)). Thereafter, the trial court held a dispositional hearing to determine whether the respondent should be confined in a secure institution or could be conditionally released, and it ruled that the latter placement alternative was appropriate. The State appeals. We affirm.

BACKGROUND

The respondent is a Roman Catholic priest. In January 2004, he pled guilty to three counts of aggravated criminal sexual abuse (720 ILCS 5/12--16(c)(1) (West 2002)) in connection with his abuse of three boys between the ages of 10 and 12 while he was a priest in Hinsdale between 1980 and 1984. In each case, the respondent asked the boy to disrobe and try on a "costume" consisting

of a small sash that the respondent wrapped around the boy's waist and through his legs. In the process, the respondent touched and fondled the boy's genitals and buttocks. With one of the victims, the respondent repeated these activities 20 to 30 times over a two-year period. After the respondent entered his guilty plea, the State nol-prossed two other counts. The respondent was sentenced to three five-year sentences of imprisonment, to be served concurrently. The respondent did not appeal, seek to withdraw his guilty plea, or otherwise challenge his convictions or sentences.

On April 7, 2006, shortly before the respondent was to be released from prison and begin serving his term of mandatory supervised release, the State petitioned to have him adjudicated a sexually violent person (SVP) pursuant to the Act. The respondent stipulated that there was probable cause to commit him as an SVP pending trial on the matter. The SVP adjudication was tried before a jury on two days in March 2008. Two expert witnesses, Dr. Amy Phenix and Dr. Ray Quackenbush, testified on behalf of the State. The respondent also presented two expert witnesses, Dr. Steven Gaskell and Dr. Orest Wasyliw. All of the doctors interviewed the respondent and reviewed the records of his offenses of conviction and also records relating to additional victims whom the respondent admitted abusing. The respondent admitted to having sexual contact with approximately 30 boys between the ages of 9 and 17, starting in 1972 and not ceasing until his arrest in 2002. His preference was for 12- or 13-year-olds. Generally, he used the "costume" ruse described above. However, he also told some boys that they were participating in a "medical experiment" involving placing or washing with a warm or wet cloth on several parts of their bodies; gave some boys "questionnaires" about their sexual practices; and took pictures of some of the boys wearing the "costume" and posing. In general, the incidents involved the boys disrobing and the

respondent touching or fondling the boys' genitals; none of the incidents involved the respondent disrobing or any penetration.

Dr. Phenix testified that the respondent had attended therapy off and on from 1983 through 1990, although much of it was not specifically oriented toward sexual offenders. At one point in the mid-1980s, the respondent lived in the House of Affirmation, a treatment center in California, for 10½ months. The respondent continued to abuse boys throughout the time that he was in therapy. The respondent did not receive any treatment for sex offenders while he was in prison.

All of the doctors who testified at trial administered actuarial tests designed to predict how likely the respondent was to be rearrested for a sexual offense: the Static-99, the Static-2002, and the Minnesota Sex Offender Screening Tool - Revised (MnSOST-R). All testified that the respondent scored a 3 on the Static-99, placing him in the moderate-low category for risk of rearrest, and that his score on the MnSOST-R indicated that he was at low risk of being rearrested for a sexual offense within six years. Dr. Phenix testified that the tests underestimated the likelihood of reoffending, however, because they were designed to measure the chance of another arrest or conviction for a sexual offense, not the chance that someone would commit another sexual offense. Dr. Phenix administered the Hare Psychopathy Checklist - Revised to the respondent, who scored in the low range. Dr. Gaskell administered the Minnesota Multiphasic Personality Inventory (MMPI) and concluded that the respondent's score indicated a higher risk of recidivism. Dr. Wasyliw administered various other tests, including the Abel-Becker Cognitive Scale and the Multiphasic Sex Inventory, both of which measure beliefs and thinking common to sex offenders, and the respondent scored very low, indicating that he shared almost none of the usual thinking and beliefs of sex offenders.

To establish that the respondent was a sexually violent person, the State was required to prove that he had been convicted of a sexually violent offense (this was uncontested), and that he suffered from a mental disorder that made it substantially likely that he would engage in acts of sexual violence in the future. 725 ILCS 207/5 (West 2006). All of the doctors agreed that the respondent has a mental disorder, pedophilia (in his case, a sexual attraction to boys), that compels him to commit sexual offenses. The doctors agreed that pedophilia is a lifelong disorder that does not spontaneously cease. In addition, Dr. Phenix and Dr. Quackenbush believed that the respondent suffered from paraphilia not otherwise specified, nonconsensual, in that he was sexually aroused by fantasies or sexual behavior involving sex with persons who did not or were unable to consent to sex. Finally, Dr. Quackenbush stated that he believed that the respondent exhibited signs of sexual sadism and fetishism.

As to the likelihood that the respondent would engage in acts of sexual violence in the future, Dr. Phenix and Dr. Quackenbush believed that such reoffense was likely, while Dr. Gaskell and Dr. Wasyliw disagreed. Dr. Gaskell stated that, although the respondent's scores on the actuarial tests suggested a low risk of recidivism, he considered several other factors associated with a higher risk of reoffending, including the respondent's sexual interest in children, his high scale score on the MMPI, the fact that he did not penetrate his victims, his tendency to view himself as a child "experimenting" rather than as an adult abuser, his attitudes tolerant of sexual offending, and his belief that he was not likely to reoffend. Nevertheless, Dr. Gaskell believed that the respondent was not substantially likely to engage in sexual offenses in the future, primarily because of his age, which reduced the likelihood of recurrence. (The respondent was approximately 64 years old at the time of trial.) In rendering his opinion, Dr. Gaskell noted that he was employed by the Department of

Human Services and that, although he had performed many evaluations of sexual offenders and testified for the State at many SVP determinations, the respondent was the first sexual offender whom he evaluated as not posing a substantial risk for reoffense. Dr. Wasyliw also testified that the respondent was not likely to reoffend, based on his age, his low scores on the actuarial and other tests, and the lack of acute risk factors such as a mood disorder, problems with anger or hostility, or alcohol abuse. Dr. Wasyliw found it significant that, upon release, the respondent would not have "priestly powers" that he could use to "entice or manipulate children the way he did" in committing his previous offenses. On March 19, 2008, the jury apparently adopted the view that the respondent's pedophilia made him substantially likely to engage in acts of sexual violence in the future, as it held that the respondent was a sexually violent person.

The case then proceeded to the next step, determining the appropriate disposition for the respondent and entering an initial commitment order reflecting that disposition. The dispositional hearing was held on February 27, July 8, and July 9, 2009. The evidence included the following. If the trial court determined that secure confinement was the most appropriate disposition, the respondent would continue to be confined at the Treatment and Detention Facility (where he had been residing following his release from the Department of Corrections), and would receive 15 hours per week of therapy in an intensive treatment program. If the respondent were conditionally released, he would likely be subject to the following restrictions and conditions: 3 hours of treatment per week (half in individual therapy and half in group therapy); house arrest for the first 30 days and GPS monitoring thereafter; a prohibition on going anywhere that children gather, being anywhere that alcohol or drugs are used, and having access to a computer or pornography; and sexual response testing every 6 months. He would be subject to unannounced home visits, drug testing, and

monitoring of any job or volunteer work. The conditions could be relaxed over time if the respondent were compliant. The respondent's sister testified that the respondent could live with her if he were released, and there was testimony that the respondent would receive a church pension and social security sufficient to provide for his living expenses.

Regarding the respondent's mental state and the likelihood that he would reoffend in the future, Dr. Phenix testified for the State, and Dr. Wasyliw and Dr. Gaskell testified for the respondent. In general, these expert witnesses testified consistently with their trial testimony. However, at the dispositional hearing, Dr. Phenix testified that, after her deposition but before the trial, she had adjusted the respondent's score on the Static-99 and the Static-2002 actuarial tests. She had initially scored him as a 3 on the Static-99, and had testified to that effect at the deposition. At trial she was not permitted to testify differently from her deposition testimony regarding the respondent's score. However, after the deposition she had rescored the respondent as a 4 based on new information, giving him an additional point for a "stranger victim" in connection with his report of sexual encounters with three adult male strangers. He had made this report on the Abel Assessment of Sexual Interest (one of the tests Dr. Wasyliw gave the respondent). This score placed the respondent in the medium-high risk category rather than the medium-low category. Dr. Phenix also rescored the respondent as a 4 on the Static-2002 test, but on this test that score placed him in the low-moderate range of risk. As she had previously testified at trial, he scored in the low range on the MnSOST-R.

Dr. Phenix was cross-examined regarding her changes to the scores on the two actuarial tests. Dr. Phenix conceded that her notes suggested that she initially believed the "stranger victim" was Brian, one of the respondent's earlier victims, and that this was incorrect. The respondent's attorney

suggested that the reported sexual encounters with three adult male strangers could refer to the respondent's trip to a male strip club (at the suggestion of counselors at the House of Affirmation) where he touched some of the performers but reported that he did not become aroused by the experience and instead was "scared." Dr. Phenix agreed that the reported sexual encounters with adult males could have been a reference to this strip club visit, but she discounted this possibility because there was no indication that the touching at the strip club was sexual. Rather, Dr. Phenix believed that the report of sexual contact with adult male strangers was untruthful, and that it most likely referred to contact with a boy stranger, because throughout the respondent's lengthy history it appeared that his sole sexual attraction was to boys. However, Dr. Phenix admitted that if the respondent's reports of consensual sexual contact with adult males was truthful, it would not warrant the addition of the extra point to the actuarial tests, because that point was to be added only for nonconsensual sexual contact.

At the close of the hearing on July 9, the trial court ruled, stating as follows:

"I want to start out by saying what this hearing is and what it is not. We have all heard the nature and the extent of Mr. Lenczycki's offenses. However, this is not a criminal disposition. Mr. Lenczycki has been convicted and has served the time that was mandated by the court, and he is no longer under the jurisdiction of the Department of Corrections. This is not a criminal proceeding.

This is a civil proceeding under the Sexually Violent Persons Commitment Act. The United States Supreme Court has addressed a similar *** statute *** and determined that it is not unconstitutional because it is not a criminal proceeding. It is a civil proceeding aimed

at treatment of a mental disorder, and the focus of this proceeding is treatment. It is not punishment.

The offenses that Mr. Lenczycki committed were terrible offenses. There is no one in this courthouse, probably no one in the country, who would deny that these offenses were terrible and that they had a great effect on the victims, but that is only one of the things that this Court can consider.

* * *

*** I am required to look at all of the factors that are a part of this statute. I believe that I read them into the record before, and they are contained in the Sexually Violent Persons Commitment Act in Section 40, since this is the initial hearing. This is not a yearly petition. This is the initial dispositional hearing.

It is very clear and had been determined by the jury that Mr. Lenczycki suffers from a mental disorder, namely pedophilia. This is a mental disorder, and the judges in this courthouse routinely hear cases involving other types of mental disorders. The standard that must be applied in this case is the same as those cases.

In order to restrict someone's liberty for the protection of that person and for society, the restriction has to be the least restrictive alternative.

I have paid careful attention to the testimony of the witnesses. I've reviewed the testimony of Dr. Phenix from when she was here in February. And I have weighed their credibility. I've weighed their bias or prejudice, as well as their testimony.

I think it is very telling in this case that Dr. Gaskell is under contract--or his employer is under contract to the State of Illinois and that he in the course of his employment rendered

an opinion that the least restrictive environment for Mr. Lenczycki should be conditional release.

I think that Dr. Phenix, as was pointed out by [the respondent's attorney], rather arbitrarily and without foundation in the record, increased a score so that her opinion changed over time as to the likelihood of Mr. Lenczycki reoffending.

I think that the evidence is clear that under the things that I have to look at in the statute, the least restrictive environment for Mr. Lenczycki is conditional release."

The trial court went on to state that the Act provided for multiple restrictions that could be imposed on his release, that if the respondent's movements were not restricted enough by the treatment team they would certainly be restricted even more by the court, and that "Mr. Lenczycki's movements, his activities, his life, every aspect of his behavior, will be regulated to the full extent that they possibly can while he is on conditional release." The trial court then entered an order finding that the respondent could be conditionally released upon the adoption of an appropriate treatment plan, and that he was to remain in the detention facility until then. On September 24, 2009, the trial court approved the conditional release plan. In addition, the trial court required that the State be provided with the reports relating to the respondent's outpatient care on a weekly basis. The State filed a timely notice of appeal regarding the respondent's conditional release. The State also filed motions in the trial court and in this court to stay the respondent's release pending appeal. Both of those motions were denied.

ANALYSIS

Before we turn to the merits of the appeal, we pause to address the respondent's argument that the State forfeited its arguments on appeal because it did not file a posttrial motion. Under Supreme

Court Rule 366(b)(2)(iii) (155 Ill. 2d R. 366(b)(2)(iii)), when a party appeals in a civil case that was heard by a jury, all points that it wishes to raise on appeal must be raised before the trial court in a posttrial motion. However, no posttrial motion is necessary when the judgment or order being appealed stems from a nonjury proceeding. 155 Ill. 2d R. 366(b)(3)(ii). Here, the appeal relates solely to the dispositional hearing, a nonjury proceeding, and thus no posttrial motion was necessary. The sole support cited by the respondent for his forfeiture argument is distinguishable because that case involved an appeal from a jury's determination that the respondent there was a sexually violent person. In re Detention of Lieberman, 379 Ill. App. 3d 585, 603 (2007). Thus, under Rule 366(b)(2)(iii) a posttrial motion was required, and the failure to file such a motion resulted in the forfeiture of any assignment of error. Lieberman, 379 Ill. App. 3d at 604. Here, however, the trial court judge was the finder of fact in the dispositional hearing that is the sole proceeding being challenged on appeal. Accordingly, no posttrial motion was required.

At oral argument, the respondent suggested that a dispositional proceeding under the Act should be viewed as being similar to the sentencing phase of a criminal proceeding--part of the same case as the trial at which guilt was determined, and therefore governed by the same requirement of a posttrial motion in order to preserve claims of error. The respondent cited no support for adopting such an approach in a proceeding under the Act, and we are aware of none. "Although individuals subject to the Act are afforded certain procedural safeguards similar to those afforded in criminal prosecutions, proceedings under the Act are civil, not criminal." In re Detention of Hardin, 391 Ill. App. 3d 211, 216 (2009), aff'd, 238 Ill. 2d 33 (2010). In affirming our decision in Hardin, the supreme court stated that "the statutes and supreme court rules generally applicable in civil cases" governed the State's appeal of the trial court's finding of no probable cause under the Act. Hardin,

238 Ill. 2d at 43; see also 725 ILCS 207/20 (West 2006). The rules relating to civil appeals, including Rule 366(b)(3)(ii), apply equally here. We therefore decline to find that the State's failure to file a posttrial motion resulted in the forfeiture of its appeal.

We turn to the substance of the appeal. The State raises two arguments: that the trial court disregarded the manifest weight of the evidence in finding that Dr. Phenix "arbitrarily and without foundation in the record" rescored two of the respondent's actuarial tests, and therefore erred in discounting her credibility; and that the trial court's overall determination that the respondent should be conditionally released was an abuse of discretion. Both of these arguments amount to no more than a request that we reweigh the evidence to arrive at a different conclusion, however, and this we will not do. As we stated in a similar case:

> "It is not our function, in reviewing a challenge to the sufficiency of the evidence, to retry the defendant. [Citations.] Instead, it is the province of the trier of fact to evaluate witness credibility, resolve conflicts in the evidence, and draw reasonable inferences therefrom." In re Detention of Welsh, 393 Ill. App. 3d 431, 455 (2009).

The trial court's comment that Dr. Phenix's rescoring of the actuarial tests was "without foundation in the record" is supported by Dr. Phenix's testimony. Dr. Phenix admitted that she did not know for sure what the respondent's report of three adult male sexual encounters referred to, and that her addition of one point to the scores was based upon her disbelief of the respondent's self-report and her assumption that the report instead referred to a sexual encounter with a boy stranger. While Dr. Phenix may have had a basis for her disbelief of the respondent in light of his admitted overwhelming preference for boys as the objects of his sexual activities, her assumption that his report regarding sexual contacts with adults "really" referred to an encounter with a boy strangers

was not similarly supported and was instead merely an assumption. Thus, this opinion was literally "without foundation in the record," and the trial court's characterization of it as such was not against the manifest weight of the evidence.

The State also argues that the trial court demonstrated error in other statements regarding Dr. Phenix's rescoring, specifically in its statement that Dr. Phenix "increased a score so that her opinion changed over time as to the likelihood of Mr. Lenczycki reoffending." We agree that the record reflects that Dr. Phenix's opinion regarding the likelihood that the respondent would reoffend did not change over time. Rather, in all of the testimony and reports that she provided, Dr. Phenix consistently opined that he was likely to reoffend. Nevertheless, we believe that the trial court's statement, while phrased inaptly, accurately reflected its belief that Dr. Phenix disregarded the original results of the two actuarial tests and changed their scores in order to provide support for her opinion. This assessment is supported by the record, including a statement by Dr. Phenix that even if the actuarial tests remained at their original levels of 3, she would still believe that the respondent was likely to reoffend. Thus, the trial court's implied finding that Dr. Phenix had ignored or manipulated the original test scores in order to provide support for her opinion was not contrary to the manifest weight of the evidence.

As for the trial court's overall conclusion that conditional release was appropriate in this case, we do not find that the trial court abused its discretion. Section 40(b)(2) provides that a person adjudicated as a sexually violent person may be either (a) confined to receive institutional care in a secure facility or (b) released from confinement subject to various conditions (conditional release). In making this determination the trial court is to consider: (1) "the nature and circumstances of the behavior that was the basis of the allegation[s]" in the petition for adjudication as a sexually violent

person; (2) "the person's mental history and present mental condition"; (3) "where the person will live"; (4) "how the person will support himself or herself"; and (5) "what arrangements are available to ensure that the person has access to and will participate in necessary treatment." 725 ILCS 207/40(b)(2) (West 2006). Here, the trial court stated that it considered all of these factors, and we see nothing to suggest that it did not. Its comments demonstrate that it was well aware of the gravity of its determination and took great care in reaching its decision. Indeed, the State's arguments on appeal do not address these factors, but simply assert that the respondent poses too great a risk of reoffending to be safely released into the community no matter how many conditions he is subject to.       Our review of the record reveals ample support for the trial court's determination. Both Dr. Gaskell and Dr. Wasyliw believed that the respondent was unlikely to reoffend for a variety of reasons, and all of the actuarial tests administered by the various doctors (including the tests rescored by Dr. Phenix) reflected a low or, at most, moderate risk of rearrest for similar offenses. The State makes much of Dr. Phenix's opinion that the respondent's age was not a mitigating factor in this case, but her opinion conflicted with those of Dr. Gaskell and Dr. Wasyliw. As we have noted, it is the function of the trial court to resolve such conflicts in the evidence. The State also points to the respondent's lengthy history of abuse and "his numerous failed attempts at community-based treatment" as supporting the need for confinement. However, the respondent accepted responsibility for his actions, voluntarily admitted to previously unknown offenses, and has been motivated and cooperative during his treatment in the secure detention facility. Moreover, Dr. Phenix conceded that the treatment the respondent received in the past probably would not meet the requirements for sex offender therapy today, whereas the therapy he was receiving now would be more effective. Finally, the restrictions and conditions imposed on the respondent during his release are extensive.

Thus, "we find no valid reason to substitute our judgment for that of the trier of fact." Lieberman, 379 Ill. App. 3d at 603.

We note that, although we find no abuse of discretion in its ultimate conclusions, we are troubled by certain statements the trial court made in announcing its decision, specifically its statement that it was required to select the least restrictive alternative for the respondent. Unlike the Mental Health and Developmental Disabilities Code (405 ILCS 5/3--800 (West 2006)), to which the trial court alluded in its statements regarding "cases involving other types of mental disorders," the language of the Act places no "least restrictive alternative" requirement on the trial court. Rather, the Act states that an order of commitment for a sexually violent person must specify "either institutional care in a secure facility *** or conditional release," and that the court must consider the five factors discussed above in determining which of these dispositions is most appropriate. However, it does not express a preference for either alternative. 725 ILCS 207/40(b)(2) (West 2006). Once a court has made its determination, the statute then mandates that the Department of Human Services "shall arrange for the control, care and treatment of the person in the least restrictive manner consistent with the requirements of the person and in accordance with the court's commitment order." 725 ILCS 207/40(b)(2) (West 2006). Thus, the Act imposes a "least restrictive" limitation not on the court in making its determination, but on the Department in carrying out that determination. Illinois case law also suggests that selecting the "least restrictive alternative" is a requirement under certain statutes, but it is not a constitutional requirement of due process. See Bernstein v. Department of Human Services, 392 Ill. App. 3d 875, 888-93 (2009) (discussing at length and rejecting the argument that due process requires the selection of the least restrictive alternative in treating mental disorders). We do not explore this point further, however, because the

State has forfeited any assignment of error on this point by failing to raise it in its appeal. 210 Ill. 2d R. 341(h)(7) (points not argued are forfeited).

For all of the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

ZENOFF, P.J., and BURKE, J., concur.